E-FILED
Friday, 22 March, 2019  04:54:31 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT,
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION


| | |
|---|---|
| REBECCA MINICK, | ) |
| | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| | ) |
| MICHAEL WILLIAMS, | ) |
| Director of the Probation Office | ) |
| Of Champaign County; | ) |
| CIRCUIT COURT OF THE SIXTH | ) |
| JUDICIAL CIRCUIT, CHAMPAIGN | ) |
| COUNTY, ILLINOIS; | ) |
| KWAME RAOUL, | ) |
| Illinois Attorney General. | ) |
| | ) |
| | ) |
| Respondent. | ) |


**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS
CORPUS/PETITION TO VACATE HER CONVICTION AND SENTENCE, AND
REQUEST FOR DISCOVERY AND AN EVIDENTIARY HEARING**

The Defendant-Petitioner (hereinafter "the Petitioner"), Rebecca Minick, is on

probation until July 4, 2019, and under obligation to pay restitution in the amount

of $10,213 to the Blind Pig c/o Christopher Knight, pursuant to the judgment of this

Honorable Court (most of which has been paid, but not all).  By and through her

attorney, Richard Dvorak, of DVORAK LAW OFFICES, LLC, pursuant to 28 U.S.C.

§ 2254, the Rules Governing Proceedings in the United States District Courts under

said section, as well as the Constitution of the United States, respectfully moves

this Honorable Court for an order vacating the Petitioners' convictions and sentences in the case of *People v. Minick,* 13 CF 1995.  Petitioner also requests an evidentiary hearing and discovery to further develop the allegations set forth herein.  In support of this request for relief, Petitioner states the following:

## PARTIES

1. The Petitioner, Rebecca Minick, is a resident of Champaign, Champaign County, Illinois, and is currently serving a term of probation arising from the case of the *People of the State of Illinois v. Rebecca Minick*, 13 CF 1995.

2. Respondent Michael Williams is the Director of the Probation Office for the Champaign County, and he has custody over the Petitioner.

3. Alternatively and/or additionally, the Petitioner is in the custody of the Circuit Court of the Sixth Judicial Circuit, Champaign County, another Respondent in this case.

4. Alternatively and/or additionally, Respondent Kwame Rauol, Illinois Attorney General, represents the State of Illinois, and is an interested party who is in the best position to determine who is the proper respondent in this case.

## CONVICTIONS AND SENTENCES IMPOSED

1. The Petitioner's conviction in Case Number 13 CF 1995 was imposed by the Hon. Judge Heidi N. Ladd, a circuit court judge in the Sixth Judicial Circuit Court in Champaign County, Illinois.

2. After a bench trial, on July 29, 2016, this Court found the Petitioner not

2

guilty of felony theft, as charged in Count 7 of the Information, but guilty of felony theft, as charged in Counts 4, 5 and 6 of the Information.

3. The Petitioner then retained new counsel, and filed a motion for new trial, which was denied on December 7, 2016 (C. 1241).

4. The motion for new trial was 33 pages long, and contained 17 exhibits, consisting of 788 pages (see Pet. Amended Mot. For New Trial)

5. Although the Petitioner requested an evidentiary hearing (Pet Amended Mot. for New Trial, 33), the court denied this request, and denied the motion without an evidentiary hearing. (C. 1241)

6. On January 4, 2017, the Petitioner was sentenced to 30 months of conditional discharge; the sentencing order was not entered until January 5, 2017 (C. 1199).

7. A condition of the Petitioner's conditional discharge is that she pay restitution in the amount of $10,500, dispersed by the Circuit Court to the Blind Pig Co. c/o Christopher Knight.  She has paid most, but not all, of this amount.

## TRIAL AND DIRECT REVIEW

8. Petitioner waived her right to a jury trial, and her case proceeded to a bench trial.

9. Petitioner testified at trial.

10. After the evidence was submitted and both sides made closing arguments, the trial court found the Petitioner guilty of felony theft, as charged in

3

Counts 4, 5 and 6.

11. The Petitioner, represented by the undersigned (new counsel to the litigation), filed an Amended Motion for New Trial that included a substantial number of exhibits not included in the trial record.

12. The Amended Motion for New Trial was denied without an evidentiary hearing, even though the Petitioner requested such a hearing (R. XVI-40).

13. Petitioner filed a timely notice of appeal on January 5, 2017, then a direct appeal from the judgment of conviction on February 16, 2017 in the Fourth Judicial District Appellate Court of Illinois.

14. In her appeal, the Petitioner alleged that the State failed to prove the Petitioner guilty beyond a reasonable doubt, and that she was denied her Constitutional right the effective assistance of counsel (Def. Br., 33).

15. On February 8, 2018, the Appellate Court affirmed the Petitioner's convictions in a Rule 23 unpublished order. *People v. Minick,* 2018 IL App (4th) 170071-U (**Exhibit F** – Appellate Court Opinion).  However, the Appellate Court accepted that the State's figures calculating restitution were incorrect and ordered that the amount of restitution be decreased. *Id.* at ¶ 45.

16. On November 6, 2018, the Petitioner was notified that the Appellate Court amended the restitution amount to reflect the actual amount owed to Chris Knight, from $10,500 to $10,213.

17. Following the appellate court's decision to affirm, the Petitioner filed a Petition for Rehearing with the Appellate Court on March 1, 2018.

4

18. The Petition for Rehearing was denied on March 12, 2018.

19. A timely Petition for Leave to Appeal ("PLA") was filed on April 15, 2018.

20. On October 31, 2018, the Illinois Supreme Court denied the PLA.

## COLLATERAL PROCEEDINGS

21. The Petitioner did not file any post-conviction petitions.

## PETITIONER'S CLAIMS

22. First, the Petitioner contends she was denied her Sixth Amendment right under the United States Constitution to the effective assistance of counsel, and that the Appellate Court unreasonably applied established federal law in denying her claim.

23. Second, the Petitioner contends she was denied her Fifth Amendment right under the United States Constitution to have the government prove its case beyond a reasonable doubt, and that the Appellate Court unreasonably applied federal law in denying her claim.

24. In support of these claims, the Petitioner submits the following Memorandum of Law.

## MEMORANDUM OF LAW

<u>Statement of Facts</u>

### David Krchak (R. IX-20-23)

David Krchak had been an attorney for 35 years, working primarily in management-side employment law and civil-rights defense work (R. IX-20).  On July 20, 2011, Krchak advised Christopher Knight, the owner of The Blind Pig and The Blind Pig Brewery/Twilight Lounge, on an employment law issue related to his two business locations (R. IX-20-23).  Knight was concerned with one of his employees, the Petitioner, the business manager (R. IX-23).  Knight was concerned with the Petitioner's "loyalty" to Knight (R. IX-23).

Krchak never testified he was concerned with the Petitioner's job performance.

### Andrew Gravlin (R. IX-29-X-223)

Andrew Gravlin was the manager of The Blind Pig and The Blind Pig Brewery in Champaign for over three and a half years, working for Chris Knight, the owner (R. IX-30).  Before he was a manager, Gravlin worked as a bar back and a bartender (R. IX-31).  While he was there, he worked with the Petitioner, who was the manager (R. IX-31-32).  He had since taken over her position, for which his duties included handling money, hiring, firing, and bookkeeping (R. IX-32).  In 2011, in the event of cash register problems, payroll errors, or a variety of other situations, Gravlin would report to the Petitioner (R. IX-33).

In 2012, the Petitioner began training Gravlin to be a manager (R. IX-33-34).

6

As part of that training, she taught him how to count down the cash drawers the morning following a given day of business (R. IX-35).  This involved taking the drawers and counting them down to $440, which is the amount of money the drawers started with each day (also known as "the float") (R. IX-35).  The remaining cash was then counted, and the amount was recorded on the daily envelopes (R. IX-36).  The count occurred at each respective location, then the money was stored at that particular bar; one was in the storage room of The Blind Pig Brewery/Twilight Lounge, the other in the basement of The Blind Pig (R. IX-36).

A variety of information was recorded with these sheets; most importantly, the difference between the sales for the night and amount of cash in the register (R. IX-36-44).  Overages and underages could reflect a variety of causes, from miscounting to ringing items up improperly to employees stealing from the drawer (R. IX 43-47).  The envelopes were not filled out until the morning after a given shift, and in the meantime, the money was stored in the office of the Blind Pig Brewery and the basement of the Blind Pig (R. IX-47).

Deposit slips would be filled out at the same time as the envelopes (R. IX-52).  The deposit slip should have reflected the total amounts received at happy hour and at the close of business, as recorded on the envelope (R. IX-55).  After doing the daily sheets, the manager would e-mail Chris Knight a report of the totals at each bar, along with the corresponding date from the previous year, so that he could compare the two (R. IX-55-56).  At this point in Gravlin's testimony, the State attempted to introduce a document that trial counsel had not had an opportunity to

7

review, so the trial was continued (R. IX-57-65).  When Gravlin returned, the State

methodically walked him through a spreadsheet that it had generated comparing

the amounts of cash reflected on the daily envelopes to the amounts of cash

reflected on the bank deposit slips (R. X-1-80).  The underlying documents were

numbered People's Exhibits 6.C.1 through 6.C.55, and summarized in People's

Exhibit 9.[1]  In summary, Gravlin identified 50 instances[2] in which deposits allegedly

made by the Petitioner were lower than the envelope cash total for the same date

(R. X-1-80).

The Petitioner also trained Gravlin the processes of producing payroll and

preparing taxes (R. X-80).  The Petitioner and later Gravlin would prepare the

monthly and quarterly taxes, while an accountant did the year-end taxes (R. X-81).

This included W-2 and I-9 forms for employees (R. X-81-82).

Gravlin identified a document regarding a roof loan the Petitioner took out,

which the Petitioner gave him around the time he was trained (R. X-82-83).  While

at the Blind Pig, Gravlin received a regular salary (R. X-84).  He was never told he

---

[1] These exhibits are found strewn throughout the Common Law Record, and cannot
be concisely cited.  However, starting directly after C. 1800, they are listed in the
order they were presented at trial, followed by a series of e-mails sent to Chris
Knight, and finally culminating in the spreadsheet (Exhibit 9).  For whatever
reason, this portion of the common law record is not page-numbered.

[2] On appeal, the State eventually conceded that there were, in fact, only 46
instances of shortages, an ironic accounting error.  Even when the State had years
to prepare its case showing allegedly systematic theft – rather than mere
accounting error – the State still could not get the math correct, and was forced to
admit so after new counsel caught these accounting errors, something missed by the
State, the court, Mr. Gravlin, and defense counsel.

could take compensation in the form of cash from the bar, nor was he informed that he could take cash from the daily envelopes to pay bar expenses (R. X-84). He never received bonuses as a bar employee, but did receive bonuses once he became a manager, with the largest bonus he received being about $1,000 (R. X-86). He received a bonus probably two or three times a year, and could not recall ever receiving bonuses in back to back pay periods (R. X-86).

The Petitioner also trained Gravlin in how to use Quickbooks, the bar's accounting software (R. X-86-87). At the time of trial, Gravlin and the bar's accountant, Robert Overstreet, had the password to Quickbooks (R. X-87-88). Gravlin testified that that Knight would not have the password unless he asked him for it (R. X-88). The bar used Quickbooks to calculate state and federal withholding and unemployment (R. X-89-90). After information was entered into Quickbooks, checks would be cut to employees immediately (R. X-90-91). If an employee got a raise, their salary would be changed in Quickbooks and reflected in their next paycheck (R. X-92). The program could run a "Quick Report" for an employee and see a report of that employee's pay over a period of time (R. X-94-95). Gravlin ran such a report for the Petitioner in anticipation of trial (R. X-95-105).

On August 8, 2011, the Petitioner's pay increased by $119 per paycheck (R. X-105). During the pay period of March 7 through March 20, 2011, the Petitioner received a $1,000 bonus (R. XI-126). On the paystub, $400 of that bonus was marked as "employee loan repayment," which Gravlin understood to indicate that part of her paycheck was being used to pay for her roof loan (R. XI-127). For the

9

pay period between November 15 and November 28, 2011, she received another $1,000 bonus, of which $950 was marked for loan repayment (R. XI-127-128). Between November 28 and December 11, 2011, the subsequent pay period, the Petitioner received a $3,000 bonus (R. XI-129). In each of four pay periods from December 26, 2011 to February 5, 2012, she received a $250 bonus, and there was approximately a $1,222 loan repayment reflected in the records (R. XI-131-133). From January 2011 through April 2012, the Petitioner received $6,000 in bonuses, and repaid $19,838.62 (R. XI-135). While Gravlin was the manager of the Bling Pig, Knight participated very little in the preparation and filing of quarterly tax returns (R. XI-136-138).

On cross-examination, Gravlin acknowledged that he was not a party to any bonus the Petitioner may have received from Knight, nor any pay raise (R. XI-138-139). When Gravlin received bonuses, they generally numbered $500 to $1,000, and Knight would simply tell Gravlin orally to write himself a check for that amount (R. XI-140-141). Gravlin could not remember how several of his bonuses were disbursed, nor what they were for (R. XI-141-142). At one point while the Petitioner was training Gravlin, he said that she suggested he record his salary as an hourly rate, because it made it easier to ask Knight for a raise (R. XI-144). Gravlin recorded his own pay as a salary, but the Petitioner's pay was recorded on an hourly basis (R. XI-146). If Gravlin was to fire an employee, he and Knight would discuss that beforehand (R. XI-148-149). Gravlin had a good working relationship with the Petitioner (R. XI-150). He received at least one raise at the Blind Pig, in late 2012

10

or early 2013 (R. XI-150).  He received the raise orally, and did not remember how much it was for (R. XI-150-151).

Gravlin and the accountant also had access to the QuickBooks account; Gravlin never gave the password for the account to Chris Knight while he was the manager, nor did he change the password (R. XI-152-153).  When Knight was in town, he would often be at the bars, and he would ask about bank balances— because he was concerned with having too much money in the bank accounts (R. XI-154).  At times there would be delays of a day or more between when the daily envelope was filled out and when the money was taken to the bank (R. XI-160-163).  During these delays, the money would sit in the basement of the bar where any and all employees had access to it (R. XI-164-165).  There were various work responsibilities that would cause bartenders to routinely go down to the basement where the money was kept (R. XI-165-166).

Gravlin never actually saw the Petitioner making bank deposits, and never saw her removing money from any of the daily envelopes (R. XI-169).  Other people could have taken the deposits to the bank, and Knight occasionally took them himself (R. XI-170).  Overages and underages could be caused by someone mis-ringing an item or making a mistake running the registers (R. XI-171).  Sometimes, Knight would take payments directly out of the registers for himself; for instance, he would occasionally take money out of a register to go get a haircut (R. XI-172).

At this time in his cross-examination, Gravlin identified a deposit slip (People's Exhibit 631) which he personally filled out that was short $120 (R. XI-189-

11

190).  He acknowledged that he may have revised the deposit slip once he got to the bank, and indeed that it is possible that many of the deposit slips that appeared to be short may have been changed once they went to the bank (R. XI-191-192).  He could not say exactly where the missing $120 from the slip he filled out was, but speculated that someone could have taken it, or it could have been miscounted (R. XI-192).  In particular, he testified that the discrepancy could have been caused by someone going down to the basement and taking money out of the bag (R. XI-192).  Some of the discrepancy could have been a $20 payment to the bar's trivia night (R. XI 192-193), for example.

Gravlin denied taking money inappropriately (R. XI-193).  The source of a discrepancy could also be a mathematical error, he explained (R. XI-194-196).  Gravlin denied that bartenders had stolen money in the past, but he acknowledged that they had keys to the basement, customers could access the key if they knew where it was, and bartenders who were off shift would hang out at the bar and knew where the key was (R. XI-196-197).  He reiterated that the "float money" was money put in the registers at the beginning of a shift so that cashiers could give out change (R. XI-202).  Deposits would generally be made in mostly larger bills, because smaller bills were needed for change (R. XI-202).

On redirect examination, Gravlin testified that the envelope with a discrepancy on it discussed during his cross-examination was generated while he was being trained by the Petitioner, and it appeared that she altered the deposit amount (R. XI-203-204).  He received four bonuses in 2013, but all of them were

12

spaced at least two months apart from one another (R. XI-204-205).  If there were errors in the float, it would not generate a discrepancy between the envelope and the deposit slip, because it would just show up as an over-under for the day on the envelope (R. XI-206).  This would also occur if Knight borrowed money and failed to document it (R. XI-207).  $20 for the trivia scorekeeper would be paid out of the drawer and would be reflected as a discrepancy between the deposit slip and the envelope, but trivia was only played on Sundays, and the discrepancies occurred on different days (R. XI-207-208).

Issues caused by math errors were common, and it was common for a math error to generate an even dollar number error, but it would not be common to generate an error in a multiple of twenty, he testified (R. XI-208-210).  Amendments to deposit slips that took place at the bank would be reflected on the face of the deposit slip (R. XI-210-211).  The pattern of discrepancies between nightly envelopes and deposit slips stopped when the Petitioner stopped working at the Blind Pig, he claimed (R. XI-214-215).  From April 5, 2011 to April 20, 2011, and from November 22, 2011 and November 27, 2011, there were no discrepancies on People's Exhibit 9 (R. XI-216).

On recross examination, Gravlin maintained that People's Exhibit 631 was altered by the Petitioner, but he acknowledged that he did not see her take the money to the bank (R. XI-217-219).  Gravlin also admitted that the envelope was not taken to the bank until three days after it was filled out (R. XI 219-220).  There were overages in 2011 and 2012, and some of them were substantial, over $20 (R.

13

XI-220).  Those overages would be caused by miscounting (R. XI-221).  When making multiple deposits in a day, it is possible that money could have been switched around between the two bars (R. XI-221).  On further examination by the State, Gravlin testified that there were instances of overages on the envelopes he reviewed, but not a pattern (R. XI-221-222).  Gravlin did not recall any overages occurring on the same date as the underages (R. XI-222-223).  He could not recall if any of the overages exceeded $40-100 (R. XI-223).

### Bob Overstreet (R. XI-224-246)

Bob Overstreet was a tax accountant who worked continuously for Knight for a period of time up to and beyond the trial date (R. XI-224-225).  Overstreet helped Knight plan and set up his corporations, prepare taxes for Knight's businesses, and prepare Knight's personal income tax return (R. XI-225-226).  In order to prepare the business returns, Overstreet would receive the QuickBooks records from the Blind Pig and the Twilight Lounge (R. XI-226).  Generally, the Petitioner brought the data to his office, and would answer any questions he had about it (R. XI-227).  If the Petitioner could not answer his questions, Knight would (R. XI-227).  He asked Knight questions about the non-tax aspects of the business that might be relevant to preparing a return, but generally did not ask him many questions (R. XI-228).

On a corporate tax return, there would be two lines for compensation—one for officer compensation, which would reflect Chris Knight's pay, and one for everyone else's payroll, grouped into one figure (R. XI-228).  Overstreet would not

14

have occasion to break the collected payroll figure down for individual employees, and Knight never asked him any questions about compensation for individual employees while he prepared the returned (R. XI-229).  Knight would typically come in and sign the tax return after it was prepared, but he never questioned Overstreet about compensation (R. XI-229).  The Blind Pig also paid quarterly taxes, but Overstreet was not involved in their preparation (R. XI-230).  He believed that the Petitioner prepared those returns (R. XI-230).  QuickBooks can be password protected, and for the Blind Pig's QuickBooks, the Petitioner, Gravlin, and probably Knight had the password (R. XI-231).

While working for Knight, Overstreet saw that there was a roof loan on the books, and he asked the Petitioner about it (R. XI-231-232).  She provided him with a schedule of loans and payments (R. XI-232-233).  In the fall of 2013, Knight approached him with questions about the loan, and in response to those questions, he went into QuickBooks and printed out the original loan schedule as well as the actual payments that were made (R. XI-233-234).  He identified People's Exhibit 26 as that printout (R. XI-235).

On cross-examination, Overstreet testified that the Blind Pig would have had to submit both W-2 forms for all of its employees and a W-3 form, which would summarize the W-2s (R. XI-236-237).  The W-3 form would have the W-2s attached to it, and would have to be signed by a corporate officer, such as Knight (R. XI-237).  The Petitioner was an employee, not a corporate officer (R. XI-236).  In 2011, 2012, and 2013, this occurred, and in each instance Knight would have signed a W-3 with

15

all of the employees' W-2s attached to it (R. XI-237-239). Though his job was not to look for red flags or discrepancies in the accounting data he received from clients, Overstreet would have informed Knight if he saw anything improper (R. XI-239-241). The Petitioner conspicuously listed her roof loan and its payments, and it did not appear that she was attempting to hide anything (R. XI-240-241). Once the tax returns were prepared by Overstreet, Knight would sign them (R. XI-241-242).

On redirect examination, Overstreet testified that W-2s do not break down pay rates, bonuses, or changes in compensation—they merely list total compensation (R. XI-242). When Knight came in to sign his federal income tax returns, they would have documents attached to them, but in Overstreet's experience, Knight would not look at those attachments before signing the front page (R. XI-243). If Overstreet looked in the payroll accounts in QuickBooks, he would have seen bonuses, but he could not say whether they were authorized (R. XI-244). On recross, Overstreet acknowledged that bonuses are taxable income and would have been included in the employees' W-2 forms (R. XI-245).

**Christopher Knight (R. XII-7-121)**

Knight is the owner of the Blind Pig Company and the Blind Pig Brewery (R. XII-7). He is the owner, president, and sole shareholder of each of the corporate entities that own the Blind Pig and the Twilight Lounge (R. XII-8). The two bars share a bar manager, who is responsible for the day-to-day running of the bar, including receiving deliveries, paying the bills, scheduling, payroll, and daily employment and personnel issues, among other things (R. XII-9). At the time of

16

Knight's testimony, Gravlin was the bar manager (R. XII-11).  Gravlin uses

QuickBooks to process payroll, track money coming into and going out of the

business (R. XII-11).  Knight testified that he has never used QuickBooks (R. XII-

11).  The program is password-protected, and he has never used the password (R.

XII-12).  Overstreet does taxes for the bars, and the manager provides Overstreet

with the necessary information to prepare taxes (R. XII-12).  The Petitioner worked

for Knight as the bar manager from 2009 to 2012 (R. XII-13).  She was paid for 40

hours of work a week at each bar, totaling 80 hours a week (R. XII-14-16).

From 2010 to 2012, Knight spent a great deal of time in England, dealing

with his father's large and chaotic estate (R. XII-16).  Every two or three months he

would spend a month or two in England (R. XII-16).  He was gone from September

29 through October 12, 2010, and while he was gone the Petitioner took care of the

bar (R. XII-18).  Knight testified that in the Spring of 2011, the Petitioner became

"intransigent and truculent," and he had a problem with her attitude, but not her

job performance (R. XII-18-19).  Because of this, in July of 2011, he contacted

attorney Krchak for advice on how to terminate her employment (R. XII-20).

However, he ultimately decided not to terminate her employment at that time,

because shortly thereafter she announced that she was going to quit anyway (R.

XII-21-22).  At that time, Knight did not suspect the Petitioner of stealing anything

from him (R. XII-22).

Knight testified that at no point after speaking to Krchak did he authorize a

pay raise or bonus for the Petitioner, nor did he authorize her to receive currency

17

from the daily revenue of the business (R. XII-22-23). He had previously granted her a loan for a roof, around October 2010 (R. XII-23). There was no documentation of the loan when he initially gave it to her, but he received some documentation from her after she finished working for him in 2012 (R. XII-24). At the time she provided the document, it seemed odd to him that the loan was paid off very quickly just as she was leaving (R. XII-25). However, he did not ask her about that at the time (R. XII-26).

Later, after she left his employment, he ran into her at a charity event at the bar in April 2013, and she ignored him, which he said caused him to doubt his trust in her (R. XII-26-27). As a result of this encounter, he claimed, Knight asked Gravlin and Overstreet to check the amounts on her loan repayment and generate a report, which was introduced as People's Exhibit 14 (R. XII-27). The State walked Knight through the series of bonuses and loan repayments earlier discussed by Gravlin (*supra* pp. 3-4 of this Brief), and he indicated that none of them were authorized (R. XII-28-36). Knight never agreed to forgive the Petitioner's loan with bonuses (R. XII-36).

On March 8, 2011, Knight received an e-mail from the Petitioner (People's Exhibit 29) purporting to negotiate compensation (R. XII-37). The e-mail included $250 a month from her pay was to go toward the roof loan, which would have accounted for less than $4,750 over the life of the loan (R. XII-38). Knight did not recall speaking with the Petitioner about her compensation in that time period (R. XII-39). In reviewing records, Knight discovered that the Petitioner received a pay

18

increase in July of 2011, just a few days after Knight spoke with Krchak (R. XII-40-
42). Through this allegedly unauthorized raise, the Petitioner gained $2,383 (R.
XII-44-45).

The revenue source for Knight's bars primarily comes from selling beer, via
cash or credit card payments (R. XII-45). The money is run through the registers
and then counted by the manager the next day (R. XII-45). The counting would
occur in the manager's office in the Blind Pig, and sometimes in the Twilight
Lounge for Twilight Lounge registers (R. XII-46). At The Blind Pig, money would
be kept in the back room (R. XII-46). When the money was counted down, the
amount of sales would be recorded on a daily ledger envelope then recorded on a
deposit slip which was placed in a blue bank bag (R. XII-46-47). The cash would
then be placed in the bag and taken to the bank (R. XII-47). Generally, both the
envelope and the deposit slip would be done at the same time (R. XII-47). If there
were overages or underages caused by a drawer being short, that money would be
reflected on the ledger envelope (R. XII-48).

After that encounter at the charity event in April of 2013, Knight and
Gravlin worked together to compile a list of suspicious transactions, via the e-mails
regarding profits the Petitioner sent Knight on a day-to-day basis (R. XII-53-56).
The transactions were suspicious to Knight because the numbers on the deposit
envelopes were lower than the cash numbers listed on the daily ledger envelopes (R.
XII-56). Knight claimed that the difference was always negative and usually in the
exact amount of $120 (R. XII-56). Knight identified People's Exhibit 9 as a list of

19

transactions he and Gravlin identified (R. XII-56, discussed *supra* pp. 4 of this Brief).  The total of these discrepancies was $5,368 (R. XII-61).  According to Knight, during two different periods in which the Petitioner was on vacation, there were no such discrepancies (R. XII-62-63).

On cross-examination, Knight acknowledged that he sent an e-mail to the Petitioner in May 2010 indicating that he had finished up the final accounting of his father's estate (R. XII-64-66).  On February 14, 2011, he sent her an e-mail (Petitioner's Exhibit 7E), in which he said that she was doing a great job and was an excellent manager (R. XII-67-68).  The e-mail also indicated that he was concerned that she was making errors because she was going too fast—specifically "errors on taxes." (R. XII-68-69).  Knight did not recall what errors he was referring to, but, despite the above testimony, Knight still denied reviewing tax information (R. XII-69).  In February 2012, he sent the Petitioner a text message asking why 2011 has been the worst year for business since 2007, and the Petitioner replied that sales were up at both locations, but so were expenses (R. XII-70).  She specifically mentioned "payroll" as one of the increased expenses (R. XII-70).

Knight did not recall telling Officer Kelly on December 5, 2013 that he authorized some of the bonuses the Petitioner received (R. XII-73).  Between the time the registers were counted and the money was taken the bank, the money was kept in the basement of the Blind Pig, and they were not kept in a safe (R. XII-74).  They were kept either in or on top of a desk, and any bartender would have access to it (R. XII-74).  Bartenders frequently went down to the basement for various

20

tasks during work (R. XII-74).  Knight denied that the money was ever kept in the basement for multiple days before it went to the bank (R. XII-75-76).  Knight did not recall an e-mail from March 8, 2011 (Petitioner's Exhibit 19) referring to a $250 payment towards the roof loan (R. XII-76).

Knight acknowledged that differences between the ledger envelope and the deposit slip could be a miscount or a matter of accounts being totaled up the wrong way on the envelopes (R. XII-83-84).  The person who filled out the envelopes was usually, but not always, the person who took the bank bags to the bank (R. XII-84-85).  A bartender could have taken cash sums out of the bank bags, Knight admitted (R. XII-85).  Trial counsel showed Knight several tax returns from 2010 with payroll totals on them, but he denied ever having seen those (R. XII-85-86).  Tax returns from 2011 showed a substantial increase in payroll, about a third of which would have been the Petitioner's salary (R. XII-87-88).  Though he was the sole shareholder of the Blind Pig company, Knight testified that he did not review the W-3s it submitted to the IRS (R. XII-88-92).  He still maintained he was unaware of the increase in payroll (R. XII-92).

Knight stated that he did occasionally give his managers bonuses (R. XII-93) When pressed regarding specific bonuses that Andy Gravlin received, he did not deny giving those bonuses, but he did not specifically remember giving them (R. XII-93-94).  He could not recall whether he gave Gravlin four bonuses in 2013, but acknowledged that it seemed likely that he did (R. XII-95).  He would have given those bonuses orally, and then Gravlin would have gone into QuickBooks and paid

21

himself the bonus (R. XII-95). When asked if he ever gave the Petitioner bonuses, he answered only that he did not give her bonuses to pay off her roof loan (R. XII-96). Knight did not have a promissory note or other documentation of the terms of the roof loan (R. XII-97).

Knight denied speaking to Krchak because he was afraid the Petitioner was going to file a discrimination lawsuit against him (R. XII-97-98). After he spoke to Krchak, he did not make any changes to the Petitioner's job duties nor did he change her payroll (R. XII-100). Though the Petitioner did not definitively tell Knight that she was leaving until after his meeting with Krchak, she told him she was considering leaving before the meeting (R. XII-101-102). Knight could not remember if he gave Gravlin a pay raise or not, but he may have (R. XII-103). If he did, that would have been done orally (R. XII-103). Until the Petitioner quit working for him, the Petitioner was listed in Knight's will as the inheritor of his business (R. XII-104-106). This was intended to ensure her loyalty (R. XII-106). Though he was concerned with her performance in 2011, he did not take her out of his will (R. XII-109). Gravlin is now the beneficiary of this clause in Knight's will (R. XII-108-109).

On redirect Knight testified that he was certain he did not give the Petitioner bonuses because he was very unhappy with her work at the time (R. XII-113-114). The pattern of bonuses he gave to Gravlin is different than the ones the Petitioner received, he claimed, because Gravlin's were several months apart and smaller (R. XII-114). Knight testified that telling the Petitioner she was doing a great job was

22

part of a "carrot and stick" management strategy to avoid alienating her (R. XII-115-116).  When Knight told her there were problems with "taxes," Knight claimed this might have referred to sales, *payroll*, or food and beverage tax, but probably not income tax (R. XII-116).  When there were discrepancies between the daily ledger envelopes and the deposit slips, there would sometimes be small errors of $15 to $20 (R. XII-119-120).  On the tax returns filed by Overstreet the bulk number for payroll expenses is laid out, but individual employees' salaries are not (R. XII-120-121).

## Motion for a Directed Verdict (R. XII-130-140)

After Knight's testimony the State rested (R. XII-130).  The Petitioner moved for a directed verdict (R. XII-130).  The trial court reserved its ruling (R. XII-140), then reserved again at the close of the State's rebuttal case (R. XIII-133), but did not ever apparently rule on the motion.

## Rebecca Minick (R. XII-142-XIII-74)

The Petitioner began working for the Blind Pig in 2007 or 2008, and became a manager in 2009 (R. XII-143).  She worked there until April of 2012 (R. XII-143-144).  She worked under Knight, the owner of the Blind Pig and the Twilight Lounge (R. XII-143-144).  As manager she handled the various day-to-day tasks necessary for running the bars (R. XII-144-145).  Knight was involved with the business—she spoke to him virtually every day, whether in person or by e-mail or text message (R. XII-145).  She sent him daily e-mails with the sales from the previous day, along with any notes about unusual happenings at the bar (R. XII-146).  After she got engaged in March 2011 she told Knight that she would be

23

leaving the bar shortly before her wedding in April 2012 (R. XII-146).

In 2011, Knight did not give the Petitioner any inkling that he was dissatisfied with her performance (R. XII-147). There were no structured employee evaluations (R. XII-147). There was no official policy as to when pay raises or bonuses were given (R. XII-147). However, the Petitioner received several bonuses, generally through an oral conversation (R. XII-147-148). Knight would tell her to give herself a bonus and then she would have it to herself in QuickBooks (R. XII-148). She, the accountant, and Knight had access to QuickBooks (R. XII-148). The Petitioner could not recall ever giving Knight the password to QuickBooks, but it was written on a clipboard that was kept in the office at all times (R. XII-148).

It was not unusual for Knight to give her bonuses in back-to-back pay periods (R. XII-149). The Petitioner did not attempt to conceal her bonuses in any way (R. XII-149). If she did not want him to see the bonuses, she would not have put them in QuickBooks (R. XII-149). In 2011 and 2012 the Petitioner received multiple bonuses, all while Knight was in the country (R. XII-151). Knight was very involved in running the business—when he was in the country, he was in the bar every day (R. XII-151-152). Money from the bar was kept in the basement of the Blind Pig, and bartenders had access to the basement all the time (R. XII-153). They went down to clock in and out, change kegs, put their coats, and restock beer, among other things (R. XII-153-154).

Knight never told the Petitioner that he was dissatisfied with her employment (R. XII-155). The Petitioner described the process for counting down

24

the drawers at the end of the day (R. XII-155-178) in a manner essentially the same as Gravlin described it in his testimony (*supra* pp. 3-4 of this Brief).  After counting down the drawers, she would trade out change, ones, and fives in the deposits for twenties, so that there would be enough small bills for change the following day (R. XII-175).  The Petitioner assumed Knight knew about this process, because that is how she was trained (R. XII-175-176).  Once everything was prepared she would place everything in a bag and put it in the desk (R. XII-176-177).

Sometimes there would be a delay of several hours, and sometimes a period of days, before she had an opportunity to take the money to the bank (R. XII-180). Knight was aware of this and did not like leaving the money lying around, but understood that at times the bar was busy and there was not time to take the money over (R. XII-180-181).  The Petitioner did not consider depositing the money a time-sensitive task in the way some other tasks were (R. XII-182).  Before the money was deposited it would sit in the office drawer which did not have a lock on it (R. XII-182-183).  It was not placed in a safe (R. XII-183).  There were security cameras in several places throughout the bar (R. XII-183).  Knight wanted the bartenders to believe they were being watched (R. XII-183).

While she was the manager, the Petitioner advocated setting up a POS system, because it was easy to make a mistake when counting the money by hand (R. XII-184).  In a hypothetical day in which the Petitioner did the envelope at 10 a.m. and made the deposit at 3 p.m., every employee in the bar would have had access to the money in the interim period (R. XII-184).  They all had keys and the

alarm code, and it was not uncommon for them to stop in if they left something behind or wanted to pick up their tips from the night before (R. XII-184).  Some bartenders hung out in the area (R. XII-185).  During that time period, 10 to 20 bartenders would probably be in and out of the bar throughout the day (R. XII-185).  At one point in 2009, Knight became suspicious that someone was stealing money from him because the Petitioner reported several unusual cash underages to him (R. XII-186-187).  Shortly thereafter, he set up a motion sensor camera in the back room, but did not change the accounting practices of the business (R. XII-187).

There were times when the Petitioner arrived at the bank and learned that the number on the deposit slip was not correct (R. XII-189-190).  Usually if this happened the Petitioner would just scratch off the number on the deposit slip, write in the correct number, and then initial it (R. XII-190).  At times the deposit slip would be too messy from various corrections, so she would just fill out a new deposit slip (R. XII-190).  Some tellers would specifically request that she fill out a new deposit slip (R. XII-190).  The Petitioner assumed that Knight was aware of this (R. XII-190-191).  When the Petitioner took the money to the bank, she would not know that the deposit slip was different from the daily ledger until she got there (R. XII-191).

On February 17, Knight sent the Petitioner a text message telling her they needed to review the figures from 2011, because it was the worst year since 2007 (R. XII-192-193).  She told him that sales were up at both bars, but that expenses were up: specifically, bar supplies, payroll, licenses, and insurance (R. XII-194-195).  The

26

Petitioner believed that the only payroll increase that year was her salary; that message was to remind him that her salary increase was one reason expenses were higher (R. XII-195).  She was not trying to conceal the fact that her payroll went up—all of the bartenders made the same amount and never got raises, and they did not add any new shifts (R. XII-195-196).  Only Bill Morgan, the brewer, and Knight's payroll was a salary that could fluctuate, but for tax reasons Knight never took a pay increase (R. XII-196).  After the Petitioner sent Knight this message, he said they could get to it next week (R. XII-196).

When there were delays between when a deposit was filled out to when the money was taken to the bank, those slips would be left in the office for the entire interim period (R. XIII-4).  She did not take them home, or put them in her car, or in any way have possession of them during that period (R. XIII-4-5).  There were times the ultimate deposits would be over the stated amount (R. XIII-6).  A number of things could have caused those overages, but it had been so long at the time of trial that she could not recall what caused a specific overage (R. XIII-6-7).

On July 27 and July 28, 2011, Knight texted the Petitioner several times and told her he was sorry about her tonsillitis, and asked if there was anything he could do for her (R. XIII-10).  These messages were sent just before the Petitioner received a pay raise (R. XIII-11).  At that time he was not giving her any indications that he thought she was doing a poor job or was considering her termination (R. XIII-14-15).  The next month, in August 2011, she orally received a pay raise (R. XIII-15).  On June 2, 2012, the Petitioner sent an e-mail to her financial advisor, Jill Lauchner,

27

indicating that she was going to get a proof of employment sheet signed by Morgan because Knight was in England at the time (R. XIII-16-21). That sheet explicitly indicated that she received a pay increase in August of 2011 (R. XIII-21). If she was trying to conceal the raise, she would not have put it on the sheet (R. XIII-21). On January 6, 2012, Knight texted the Petitioner that he had been contacted by a mortgage company, indicating that he knew that the Petitioner's financial advisor was interested in her employment (R. XIII-22-23).

In 2012, the Petitioner told Gravlin that the best way to ask for a raise was to ask for an hourly raise rather than a large lump annual sum (R. XII-24). She told him that's why she got an hourly raise (R. XIII-24-25). Knight was aware that she was being paid hourly (R. XIII-25). She had been told the exact same thing by the previous manager when she was trained (R. XIII-25). She was not trying to conceal the information (R. XIII-25). Employees at the Blind Pig had access to a variety of store merchandise like t-shirts and keychains, which they could buy and have money directly deducted from their paychecks (R. XIII-26). One payroll document indicated that the Petitioner bought $70.95 of merchandise one year (R. XIII-26). She never stole merchandise or otherwise failed to document it (R. XIII-27).

At no time in her employment at the Blind Pig did the Petitioner misappropriate any cash for her personal gain (R. XIII-27). She received the bonuses in question from Knight (R. XIII-27-28). After she left the bar, she remained in frequent contact with Gravlin because she went to work at a beer distributor and would hook him up with craft beer sales representatives (R. XIII-

28

28).  On average, she would talk to him at least weekly (R. XIII-28-29).  Her relationship with the Blind Pig was still good at that time (R. XIII-29).  She had no indication at that time that they had concerns about her time at the Blind Pig (R. XIII-29-30).  At the charity event at which Knight testified that the Petitioner was rude to him, the Petitioner did not even recall Knight saying hello to her (R. XIII-30).  She was not trying to disrespect him (R. XIII-30).

From the time she left the Blind Pig to the time of her arrest, Knight never contacted the Petitioner with any concerns he had about inappropriate pay raises or deposits, nor did Gravlin mention any concerns to her (R. XIII-31).  In addition to QuickBooks, tax documents were kept in the office at the Blind Pig in CDs and a separate external hard drive (R. XIII-31-32).  Knight had access to all of these (R. XIII-32).  The Petitioner identified the e-mail that Knight sent her on February 14, 2011, telling her she was doing a great job, but to slow down because of errors on taxes (R. XIII-32-33).  She could not recall what specific errors he was referring to, but said that it must have referred to tax errors that he saw and told her to correct, which was completely legitimate (R. XIII-33-34).

On cross-examination, the Petitioner affirmed that at no point before leaving her employment at the Blind Pig was she aware that Knight was dissatisfied with her performance (R. XIII-35).  She did not know he was speaking to Krchak about terminating her (R. XIII-35).  The Petitioner participated in hiring and then trained Gravlin, with whom she got along with well (R. XIII-35).  She did not recall giving her loan document to Overstreet (R. XIII-37).  QuickBooks kept track of the loan for

29

tax purposes, and if she did not credit her loan payments in QuickBooks, those payments would not be credited in Overstreet's record (R. XIII-37).  If she received a raise but did not record it in QuickBooks, her checks would not reflect the raise (R. XIII-37).  She had heard Knight speak to Overstreet about QuickBooks entries in the past (R. XIII-38).  The Petitioner filled out the verification of the employment sheet that she had Morgan sign (R XIII-42).  Knight did not fill it out because he was in England (R. XIII-43).  Morgan does not do payroll or have anything to do with processing compensation (R. XIII-43).  He did not, to her knowledge, do any independent inquiry when she handed him the form—he just signed it (R. XIII-43-44).

When the Petitioner counted the registers down to the float, she would keep smaller bills in the float (R. XIII-44-45).  Any miscount in making change at one bar that caused a shortfall in one bar's receipts would also cause a corresponding surplus for the other bar, if everything was counted correctly initially (R. XIII-46).  The trivia scorekeeper would generally be paid $20, but at certain points the bar was having trouble keeping scorekeepers, so they paid more in those periods (R. XIII-47).  Trivia night was weekly, and only occurred on Sunday (R. XIII-47).  The money was pulled from a deposit from earlier in the week—sometimes Saturday's deposit, but it could have been any day from the previous week—not taken directly from a register (R. XIII-48).  The largest compensation a trivia scorekeeper ever received was $40 (R. XIII-49).

When the Petitioner sent Knight an e-mail with the day's sales, she would

actually be looking at the envelopes when she relayed the numbers on them (R. XIII-50-51). When the Petitioner took the money to the bank, the teller would count the money and make her change the deposit slip if she had made errors in the slips (R. XIII-57-58). That happened frequently enough for her to feel silly about it (R. XIII-58). Whether the teller told her to alter the deposit slip or fill out a new one depended on which teller was working and how many changes she had already made to the slip (R. XIII-59). She could not say how often it happened, but it is possible that it was the 39 times she miscounted in excess of $100 (R. XIII-60). The envelopes were a business record that did not necessarily need to be perfectly accurate (R. XIII-61).

It is not necessarily the case that every single discrepancy happened when she miscounted the envelopes and was told to change the deposit slip at the bank (R. XIII-62). For instance, after she counted the open and close piles of cash, she combined them and counted them again for the deposit number (R. XIII-65). If she miscounted initially and then counted correctly for the deposit slip, there would be a discrepancy between the ledger envelope and the deposit slip, but the deposit amount would be correct and the bank teller would not bring anything to her attention (R. XIII-65). The process of counting the money twice happened every day and she taught Andy Gravlin to do it too (R. XIII-66). A discrepancy could also be explained if someone stole money from the bank bag before it was deposited (R. XIII-67). However, if a discrepancy occurred there would be no way for the Petitioner to realize it was happening at the time (R. XIII-69).

31

On redirect, the Petitioner testified that Knight had access to his Chase bank accounts online (R. XIII-71). When she made deposits, the bank teller would not see the ledger envelope, which was left at the bar (R. XIII-73). After the Petitioner's testimony, the defense rested.

The State's Rebuttal Case

## Stipulation (R. XIII-95)

At the opening of the State's rebuttal case, the parties stipulated that Champaign Police Detective Patrick Kelly interviewed the Petitioner, and that People's Exhibit 11 is a true and accurate transcript of that interview (R. XIII-95).

## William Morgan (R. XIII-97-107)

William Morgan was the brew master at the Blind Pig Brewery, and had been since 2009 (R. XIII-97-98). During that period, he never interacted with payroll, aside from being paid (R. XIII-99). He did not have access to any other employees' payroll of bonus information (R. XIII-99). Morgan recalled signing the Petitioner's employment verification form, but he could not recall whether the form was filled out at the time, nor did he independently verify any of the information if it was filled out (R. XIII-100-101). He did not discuss signing the form with Knight (R. XIII-102-103). On cross-examination, Morgan testified that he never saw the Petitioner behaving suspiciously or dishonestly (R. XIII-104). If he had seen anything suspicious, he would have brought it to Knight's attention (R. XIII-104).

## Christopher Knight (R. XIII-108-119)

Knight testified that with regard to the text message he received in which the

Petitioner mentioned increased payroll, he had no way of knowing what payroll expenses she was referring to (R. XIII-109).  When the Petitioner's mortgage company called and asked about her, they inquired about her start date, but not her compensation (R. XIII-110-111).  He did not receive any inquiries about her compensation and testified that he would not have had access to her compensation information if he had (R. XIII-111-112).  Knight was aware of the hard copies of the tax documents at the bar but he hardly ever interacted with them (R. XIII-112).  When he did interact with them it was just to get them out and give them to the bank, and he did not review them himself (R. XIII-113).

On cross-examination, Knight acknowledged that in response to the text message regarding increased payroll, he told the Petitioner they would have to look at what expenses went up and why (R. XIII-113-114).  He believed that he probably did talk to her about those increased expenses later (R. XIII-114).  While Knight denied reviewing the tax returns, they were certainly available to him to review at any time (R. XIII-116-117).

### Andrew Gravlin (R. XIII-119-130)

Andrew Gravlin testified that when counting down drawers, he would count down each drawer, then combine the two piles and count them together (R. XIII-120-121).  At that point, he would compare the deposit slip to the two shift totals and confirm that they match (R. XIII-121).  This is how the Petitioner taught him (R. XIII-121).  She compared the two totals every time he watched her do it, over 60 times (R. XIII-122).  In his four years as a manager, Gravlin had only gone to the

33

bank and been told to redo an incorrect deposit slip a handful of times (R. XIII-123).
He could not recall upon how many of those times the discrepancy was over $100 (R.
XIII-124).

On cross-examination, Gravlin testified that he is a beneficiary of Knight's
will (R. XIII-124-125). He will inherit both The Blind Pig and The Twilight Lounge
(R. XIII-125). If he was fired he would be written out of the will, yet he claimed he
had no reason to testify favorably to Knight (R. XIII-125-126). On redirect, Gravlin
noted that on four of the dates listed in the State's discrepancy spreadsheet he could
not say whether he or the Petitioner took the deposits to the bank (R. XIII-127-128).
On re-cross, Gravlin testified that he had no firsthand knowledge of any of the
deposits the Petitioner took to the bank nor did he have firsthand knowledge of
whether anyone stole money from the envelopes in the basement (R. XIII-128-129).
After Gravlin's testimony, the State rested (R. XIII-133).

**Verdict, Motion for New Trial, and Sentencing (R. XV-XVII)**

After argument, the trial court convicted the Petitioner of three counts of
theft, but acquitted her of the count relating to taking an unauthorized raise (R.
XV-43). Notably, the court stated "[a]nd it was always a shortage. There was never
a deposit turned in that was ten dollars, or 50 dollars, or 120 dollars over. It was
always a shortage that was turned in." (R. XV-13). The court also stated that "it
occurred when the Petitioner was there and stopped when she was on vacation." (R.
XV-16). The court claimed that "it's also apparent that Mr. Knight never signed
[his tax documents], they were signed by Mr. Overstreet and submitted (R. XV-29).

34

With regard to the Petitioner's bonuses, the court stated "if [the testimony of Knight and Minick] was the only evidence I believe it would be almost impossible to decipher this, but again there is one more factor that corroborates Mr. Knight's position, and that is the contact with his lawyer, Mr. Krchak" (R. XV-31).

The matter was continued for post-trial motions, and the Petitioner retained new counsel (C. 359-391). The Petitioner, through new counsel, *inter alia*, argued that the Petitioner was not proven guilty beyond a reasonable doubt, and also Petitioner's new counsel included 17 exhibits not included in the trial record, to support the Petitioner's position that the Petitioner received ineffective assistance of counsel due to trial counsel's failure to submit this evidence at trial. See Petitioner's Amended Motion for New Trial (hereinafter "AMNT", C. 359-1180).  In her Motion for New Trial, the Petitioner requested an evidentiary hearing (C. 391). The judge denied the Petitioner's Motion for a New Trial without an evidentiary hearing (R. XVI-40). The Petitioner was subsequently sentenced to 30 months of conditional discharge, plus restitution of $10,500 (R. XVII-28-30).

**Direct Appeal, Motion for Rehearing and Petition for Leave to Appeal**

The Petitioner filed an appeal from her conviction on February 16, 2017. On February 8, 2018, the Illinois Appellate Court affirmed her conviction. *People v. Minick*, 2018 IL App (4th) 170071- U.  On March 1, 2018**,** the Petitioner then filed a Petition for Rehearing. On March 12, 2018, this petition was denied without a rehearing or further briefing. On April 15, 2018, the Petitioner filed a Petition for Leave to Appeal with the Supreme Court of Illinois, which was denied on September

26, 2018.  *People v. Minick*, 2018 Ill. LEXIS 693.

## ARGUMENT

I.   **The Petitioner's was denied her Sixth Amendment Right to the effective assistance of counsel, and the Appellate Court unreasonably applied established federal law in denying her claim.**

a.  **Standard of Review**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." *U.S. Const. amend VI.*  To prove ineffective assistance of trial counsel, a criminal defendant must first demonstrate the attorney's performance at trial was deficient, meaning " 'that counsel's representation fell below an objective standard of reasonableness.' "  *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A criminal defendant must also show prejudice, meaning "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable."  *Strickland*, 466 U.S. at 687.  To show prejudice, a criminal defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694).  To prove ineffective assistance of counsel, it need only be shown that there is a "reasonable chance" the outcome would have been different, and this "needn't be a 50 percent or greater chance."  *Blackmon v. Williams*, 823 F.3d 1088, 1105 (7th Cir. 2016).

36

Pursuant to the AEDPA, a petitioner is entitled to relief if the relevant state court decision was either contrary to clearly established federal law, or involved an "unreasonable application" of clearly established federal law. *Goodman v. Bertrand*, 467 F.3d 1022, 1026 (7th Cir. 2006). Under the "unreasonable application" prong, " 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' " *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 103, 131 S. Ct. 770 (2011)). In other words, " 'the state court decision must be both incorrect and unreasonable.' " *Goodman*, 467 F.3d at 1029 (quoting *Woods v. McBride*, 430 F.3d 813, 817 (7th Cir. 2005)).

> **b. The Petitioner was denied her Sixth Amendment right to the effective assistance of trial counsel when her trial attorney failed to introduce favorable and exculpatory evidence regarding deposit slips and the "count" system at The Blind Pig and The Blind Pig Brewery/Twilight Lounge that would have supported the defense theory that any shortages were likely the result of accounting errors, not theft.**

The Petitioner received ineffective assistance of counsel because her trial attorney failed to introduce numerous documents and failed to call certain witnesses that would have been helpful to the Petitioner's case, would have impeached various witnesses, would have cast doubt on the credibility of certain witnesses, and would have generally devastated the State's theory that the money counted as shortages were the result of the Petitioner stealing money when, in fact,

37

the simplest explanation is that the shortages were the likely result of accounting errors, which were made not only by the Petitioner, but her replacements as well.

Before addressing the particulars of this evidence, however, this Court should know from the outset that the State's theory of the case is simply ludicrous.   The Appellate Court apparently conflated "over/under" accounting errors with discrepancies on the bank deposit slips.  An over/under is a common situation in which a bartender's total sales for an evening did not match the amount of money in their drawer at the end of the night (R. IX-43-47). Over/unders are what the Defendant reported to Knight, on a daily basis (R. XII-186-187).  The Defendant e-mailed Knight a daily report of the totals for the day every day, so he was continually on notice of routine over/unders (R. IX-55-56).  Conversely, the discrepancies at issue in this case are discrepancies between the total money counted the next morning, and the amount deposited into the bank, which was often not made until days later (R. XII-180).

The simplest explanation for such a discrepancy is that the initial total count was mistaken— an accounting discrepancy— which does not even establish that there was money missing.  Rather, it simply establishes that when the counter counted the money the first time, he or she miscounted. Both Andy Gravlin, the Defendant's replacement after the Petitioner resigned, and Knight, the business owner, testified that this was possible (R. XI-192, XII-83-84).  In its Rule 23 Order, the Appellate Court draws great significance from the fact that the Defendant did not alert Knight of shortages on deposit slips. *People v. Minick*, 2018 IL App (4th)

38

170071-U, ¶ 43.  But there was no reason to put Knight "on notice" of a miscount, because a miscount did not signify missing money, and Knight and his accountant had access to the same records.  Moreover, when the Petitioner previously notified Knight of accounting errors, Knight seemed disinterested and did not do any follow up to correcting the errors, so any such effort would have been futile.

The fact that the Petitioner did both counts exposes the fundamental absurdity of the State's theory of the case: it posits that the Petitioner, who had complete control over all day-to-day accounting of sales, inexplicably chose to record the correct sales number during the initial count, steal the money, then take the remainder to the bank, where the money would be recounted and her theft officially recorded.  Why not simply take the money before recording total sales for the day?  Why would anyone meticulously document their own theft?  The State does not allege that the Defendant did this once, perhaps not realizing that the bank would catch her error: the State alleges that she stole money in this manner 46 times, catching herself in the act every single time. Despite raising the issue in the Defendant's Opening Brief (Def. Br. 38-39) and the Reply Brief (Def. Reply Br. 9-10), neither the State nor the Appellate Court offered a rebuttal to this fundamental flaw in the State's theory of the case.  This absurdity becomes even more so when one views the unintroduced evidence, including the fact that the Petitioner also documented numerous overages.  This begs the question, why document an alleged theft as a shortage and at the same time not steal the money where there was a documented overage?

39

<u>Counts 4 and 5 (Bank Shortages)</u>

Perhaps the best way to demonstrate prejudice is to set forth the trial court's initial ruling finding the Petitioner guilty, and show how, point-by-point, evidence that was not introduced at trial undercuts the court's findings. On July 29, 2016, the court issued its oral ruling. This transcript of this ruling is attached to this Petition as **Exhibit A** (Trial Court's Finding of Guilt).

**Knight's Hands-Off Management Style**

However, before addressing the points found by the trial court that could have been contradicted by defense counsel had he introduced readily available evidence, it first must be noted that court found – correctly – that Knight utilized an accounting system that was chaotic, unmanageable, and unreliable, which is important to the specific points raised by the court in its initial ruling. The court commented that Knight's management style was "hands off, trusting to the point of naiveté, and uninvolved in the logistics of the financial details of the operation." (Ex. A, p. 6). The court found that Knight never reviewed any of the accounting books, was not involved in any of the day-to-day financial operations, and did not review any of the tax records (Ex. A, p. 6)[3]. The court found that this informal system "created the issues that led to these charges," and was thus "surprised" that the "system was still being used" even after the alleged theft was discovered (Ex. A,

---

[3] The court was incorrect that Knight did not review his tax records, as he was required by law to sign off on them as accurate, as explained by his accountant, Bob Overstreet, at trial (R. XI-237-239).

p. 8).  The court also noted that the money that was stored in an office space was unsecured from the time of the accounting up until the time the cash was deposited in the bank (Ex. A, pp. 10-11).  With this backdrop in mind, the Petitioner will address the specific evidence at issue in this case.

### Explanations for the Discrepancies[4]

First, defense counsel erred in not introducing evidence that would have undercut the trial court's conclusion that the money allegedly missing was "always shortages," not underages.  At issue in this case are the discrepancies between the total money counted the morning after the shift (usually but not always done by the Petitioner) and the money deposited in the bank (usually but not always done by the Petitioner), which was often not deposited until days later[5] (Ex. A, p. 10, 12-13)[6].

---

[4] Police interviewed the Petitioner about the discrepancies between the accounting and the bank deposits, the State introduced the interview during rebuttal (even though she was not impeached at all with this video during her cross examination), and the court found that during this interview, "her demeanor was cooperative, she appeared relaxed, she had no explanation for the shortages, said she would have to think about it." (Ex. A, p. 12).  The Petitioner did her best to explain those discrepancies at trial.  However, the court rejected those explanations for no good reason, as explained in more detail below.  It is important to note, however, that this video does not contain one admission, nor is it inconsistent with her trial testimony.

[5] Of course, this chaotic and unreliable accounting system devised by Knight made it entirely possible for employee theft to occur during the time period when this money was not secured, waiting to eventually be taken to the bank.  This fact demonstrates a major weakness in the State's case, however, the Petitioner does not rely heavily on this fact in his ineffective assistance argument, since the numerous accounting errors by multiple people – both overages and underages – point to the likely cause of the allegedly missing money to be accounting errors, not employee theft, even though theft by other employees certainly could have been a contributing factor leading to these accounting errors.

41

In its initial ruling, the court found it significant that the discrepancies were always shortages, not overages.  The court ruled, "*And it was always a shortage. There was never a deposit turned in that was ten dollars, or fifty dollars, or 120 dollars over.*" (Ex A, pp. 14) (emphasis added).

However, documents available to the Petitioner's counsel at the time of the trial show that there were, in fact, 21 instances of overages while the Petitioner was manager (C. 392-476, AMNT, Ex. A). See **Exhibit B** (Index To Common Law Record) (Def. Apx. Br. Vii).  Trial counsel's failure to present this evidence led the court to believe that the Petitioner only ever came up short when doing her accounting. This caused severe prejudice because a consistent pattern of *only* shortages raises an inference that this person was stealing, while a pattern of shortages and overages would tend to show there was a consistent pattern of accounting errors, a critical difference in a criminal theft case.

---

[6] The court found that drawer-count errors could not explain the discrepancy between the accounting at the end of the night and the deposit made at the bank because, the court found, such errors would have been caught during the first accounting (Ex. A, pp. 12-13).  However, this is incorrect because both Gravlin and Knight, the Petitioner's replacement, testified that initially miscounting the deposit was a possible explanation for the discrepancy (R XI-192, XII-83-84).  Also, the court erred in discounting the possible significance of employees taking money out of the till for trivia night on a regular basis.  The court found that the cash taken out of the drawer for trivia night would not have accounted for a significant amount, given that it was only on Sundays (Ex. A, p. 13). The unrebutted testimony of Andy Gravlin was that $20 was routinely taken out to pay for trivia night every week, not that it was only taken out on Sundays (R. XI-192-193).  In any event, the money taken out for trivia night would have accounted for about $1,000 over the relevant time period, about 20 percent of the total amount that was counted as shortages. (R. XIII-48).

Second, the court found it significant that the alleged theft "occurred when the Petitioner was there and stopped when she was on vacation," and that it supposedly stopped after she left her employment (Ex. A, p. 16). The court repeated this assertion again during its finding, noting "[shortages] stopped when she left the employment because she was the only one doing it." (Ex. A, p. 21). However, evidence available to the Petitioner's defense counsel, never introduced at trial, demonstrates that there were multiple shortages when other employees did the accounting in the Petitioner's absence; both while the Petitioner was on vacation and after she was no longer employed by the business (C. 495-504, 505-577; AMNT, Ex. C, Ex. D). This was not established at trial, of course, due to ineffective assistance of counsel. The Petitioner was prejudiced by this failure to introduce evidence because this readily available documentary evidence would have destroyed the notion that it was the Petitioner – and the Petitioner alone – who had repeated accounting shortages. In fact, her replacements after she left her employment and one of her stand-in replacements while she was on vacation did the same, and yet there was no allegation that these individuals committed theft.

In fact, there was evidence available to the Petitioner's defense counsel at trial that would have shown that the rate in which the Petitioner had shortages was lower than her replacement after she left her employment, and her rate was similarly lower than one of her vacation stand-in replacements. The Petitioner left her employment in April of 2012, and the records collected by the State ended in December of 2012, so a sampling of only eight months of Gravlin's records were

available to be analyzed, compared to 14 months of the Petitioner's records (C. 505, Ex. D). During those eight months, Gravlin had 28 shortages, 21 of which were in even dollar amounts (*Id*). This is a rate of 3.5 shortages for every month that Gravlin worked as the manager. The Petitioner, meanwhile, had 46 shortages in 14 months, which is a rate of 3.29 shortages every month during her time as the business's manager. Defense counsel should have cross-examined Gravlin by pointing out these 28 shortages, and also he should have pointed out to the court the respective shortage rates of both Gravlin and the Petitioner.

Moreover, it was not just Gravlin, but one of the Petitioner's vacation stand-ins who made similar shortage errors (C. 495, Ex. C). Knight testified at trial that, during the Petitioner's two vacation periods in this 14-month period, there were no shortages made by any of her replacements (R. XII-62-63). The Appellate Court found that Gravlin supposedly admitted at trial errors occurred while the Petitioner was on vacation (*Id*. at ¶ 58), however the Petitioner cannot find where in the Record any such testimony was provided; instead, Gravlin's testified no such errors occurred while the Petitioner was on vacation (R. XI-216). In any event, the court accepted as true that there were no shortages that occurred during the Petitioner's vacation periods, finding "it occurred when the Petitioner was there and stopped when she was on vacation." (Ex. A, p. 16).

Defense counsel was ineffective because he did not counter this testimony with evidence that during one of the vacation periods, one of the Petitioner's replacements, "Anna," a bartender, had three shortages in 6 days, two of which

were in even dollar amounts of $10 and $90 (*Id.*), further providing valuable proof that the Petitioner did not steal money from The Blind Pig, but instead her shortages were likely due to accounting error.  Even if one discounts Anna's 50-cent shortage, two shortages in six days (which would equate to 12 deposits since there were two different businesses) is a shortage rate of 17 percent.  While the Appellate Court apparently drew great significance from the fact that the Petitioner had 46 shortages, the Petitioner made approximately 910 deposit slips throughout the 14 months at issue in this case[7], so this number is not actually particularly high— about 5 percent of deposit slips submitted by the State.  As explained above, this shortage rate was less than that of both Gravlin and Anna.  This shortage rate is also less than the error rate that actually occurred at trial, wherein the State miscounted as shortages four of the 50 deposit slips, an error rate of 8 percent.

The Appellate Court cited to the *Strickland* standard, but unreasonably applied the well-established precedent.  In rejecting the Petitioner's claim, the Court (a) relied on incorrect facts, (b) wrongly applied *Strickland*'s prejudice jurisprudence[8], and (c) ignored arguments all together.

First, the Appellate Court rejected the Petitioner's claim that defense counsel

---

[7] There are roughly 475 days during this 14-month period, and the Petitioner did not work for approximately 20 days during that time period, for a total of 455 days. Thus, since she would have filled out two deposit slips for each entity, per day, this equates to roughly approximately 910 deposit slips.

[8] The Court did not rule that any of the actions of defense counsel were reasonable, and relied solely on *Strickland*'s prejudice prong in affirming the Petitioner's conviction.

should have introduced evidence of the Petitioner's overages to counterbalance the evidence of the shortages. The Court ruled, "the mere fact defendant experienced overages does not negate a showing of 46 different instances when she deposited an amount substantially less than what was recorded." *Minick*, 2018 IL App (4th) 170007-U,¶ 58. This ruling was an incorrect and unreasonable application of the *Strickland* standard for several reasons.

First, evidence of the overages – tending to show an accounting error – would have balanced the evidence of the shortages, which if proved to be a consistent, distinctive, and overwhelming pattern could potentially raise an inference of theft (not enough for proof beyond a reasonable doubt, though, as argued below). Courts will normally find the existence of prejudice where the unintroduced evidence would have balanced out the introduced evidence. See, e.g., *Stitts v. Wilson*, 713 F.3d 887, 894 (7th Cir. 2013) (finding prejudice under *Strickland*, the Seventh Circuit noted the unintroduced evidence "would have been transformed from a one-sided presentation of the prosecution's case into a battle between competing eyewitness testimony.") (citing *Smith v. Cain*, 132 S.Ct. 627, 630 (2012) (impeachment evidence was "plainly material" per *Brady*[9] to cast doubt on the State's sole eyewitness); *United States v. Augurs*, 427 U.S. 97, 113 (1976) (impeachment evidence of one of the Government's two eyewitness was prejudicial, per *Brady*)).

Second, the Appellate Court unreasonably applied *Strickland* because it

---

[9] Prejudice (materiality) per *Brady* is thus equated with prejudice per *Strickland*, and thus at times in this petition, the Petitioner cites to clearly established *Brady* law for support.

ignored the trial court's initial finding of guilt and how the trial court initially

handled the significance of the underage evidence.  In fact, the trial court put great

importance in its ruling on the fact that the 46 accounting discrepancies (again, the

prosecutor, the State's witnesses, the judge, and defense counsel mistakenly

asserted there were 50 shortages at trial) were "always a shortage" but never "over."

(Ex. A, p. 14).  It is an unreasonable application of *Strickland*'s prejudice standard

for an appellate court, in a case where the case was decided in a bench trial, to

ignore the trial court's reasoning for finding the defendant guilty.  *Mosley*, supra,

689 F.3d at 849 (analyzing how the evidence not introduced due to ineffectiveness

would have addressed concerns raised by the trial court in its bench ruling finding

the defendant guilty); see also *Dennis v. Sec'y, Pa. Dep't of Corr.,* 834 F.3d 263, 303

(3d Cir. 2016) (quoting *Wearry v. Cain*, __ U.S. __, 136 S. Ct. 1002, 1007 (2016)).

"State courts may not 'emphasize reasons a juror might disregard new evidence

while ignoring reasons she might not.' ").

   To be sure, in this case, the same trial court found in its post-trial ruling that

the evidence introduced post trial "would not change the Court's findings and

rulings even were those matters true and had they been presented at trial."  (See

**Exhibit C**) (Trial Court's Post-Trial Ruling) (also attached to the Appendix the

Defendant's Opening Brief, pp. li through lviii).  However, the court did so without

first conducting a post-trial hearing, and the court also never specifically addressed

the overages evidence and how that evidence would have directly contradicted the

court's earlier findings.  In any event, as the Seventh Circuit explained in granting

47

a petitioner's habeas corpus petition, based on ineffective assistance of counsel:

> [T]he appellate court improperly relied on the trial judge's own *post hoc* rationalization (during the proceedings on Harris's motion for a new trial) that a more diligent performance would not have changed his mind. Under *Strickland,* the assessment of prejudice is an objective inquiry that 'should not depend on the idiosyncracies of the particular decisionmaker,' which 'are irrelevant to the prejudice inquiry.' [*Strickland*], 466 U.S. at 695; see also *Raygoza v. Hulick*, 474 F.3d 958, 964 (7th Cir. 2007) ('we cannot accept as conclusive the judge's statement that the new evidence would not have made any difference to the outcome of the case'); *Hall v. Washington*, 106 F.3d 742, 752 (7th Cir. 1997) (trial judge's assertion in a post-conviction proceeding that petitioner's 'additional evidence would not have changed his mind . . . cannot, however, be conclusive'). By focusing on how the trial judge personally would have ruled in the competency hearing if Harris's counsel had performed adequately, the Illinois Appellate Court allowed subjective analysis to creep into the prejudice inquiry. The court's reasoning was therefore a misapplication of *Strickland*, under which courts must consider the effect the evidence would have had on an unspecified, objectively reasonable decision-maker — not its effect on one particular judge. *Harris v. Thompson*, 698 F.3d 609, 648 (7th Cir. 2012).

While *Harris* and *Mosley* may not seem immediately compatible, harmonizing the two principles of law is quite simple. One way of determining prejudice, per *Mosley*, is to look the actual bench ruling, and then determine how the unintroduced evidence would have undercut such a finding. To completely ignore the trial court's ruling, as did the Appellate Court, is a misapplication of *Strickland* because comparing how the unintroduced evidence addressed the concerns of the trier of fact's express reasoning is one method of demonstrating how an objective trier of fact may have viewed the evidence. This is the lesson of *Mosley*. Conversely, an appellate court cannot simply defer to that same trial court's *post-hoc* rationalization for dismissing the new evidence in determining

whether an objective trier of fact may have found the unintroduced evidence persuasive. Ultimately, the prejudice inquiry is an objective one, not a subjective one. *Mosley* used objective analysis by pointing out how a particular trier of fact could have – and did – viewed the trial evidence as an *objective example* of how the evidence could have been viewed by a rational trier of fact. *Harris*, meanwhile, teaches reviewing courts not to abandon the objective analysis when faced with the post-trial ruling of the actual trier of fact, who issues a *post-hoc* ruling dismissing newly presented evidence as not persuasive. Thus, in the end, *Mosley* and *Harris* are compatible because both methods ultimately rely upon an objective prejudice standard, something not done by the Appellate Court in this case.

Next, the Court unreasonably applied *Strickland* in concluding that defense counsel's failure to introduce evidence that other employees who performed accounting duties in the stead of the Petitioner was not prejudicial. It would be generous to conclude the Appellate Court ever addressed this issue, as it merely stated, "Although other employees also had shortages, as confirmed by Gravlin's testimony, defendant had 46 shortages and Gravlin had only a 'handful' in the three years since defendant left The Blind Pig. These instances would be insufficient to persuade the trial court against its finding of a pattern." *Minick*, 2018 IL App (4th) 170071-U, ¶ 58. This was a clearly unreasonable application of *Strickland*.

Initially, it must be noted, Gravlin did not confirm other employees had shortages, and certainly there was no documented proof of this introduced at trial. Also, it is the height of circular reasoning to cite to a witness' own trial testimony to

49

shoot down a prejudice argument when the issue is whether documentary proof that

contradicts that trial testimony resulted in prejudice.  Having shortages on a

"handful" of occasions over three years is not even close to the equivalent of having

28 shortages over an eight-month period, which is what the unintroduced

documentary evidence demonstrates (C. 505, AMNT, Ex. D).  In any event, Gravlin

did not exactly admit to having a "handful" of shortages.  Gravlin did testify in

rebuttal that he had accounting errors on a "handful" of occasions "in the past three

years," but he did not specifically testify these were shortages (R. XIII-123).  In the

State's case-in-chief, Gravlin testified the pattern of discrepancies between nightly

envelopes and deposit slips stopped when the Petitioner stopped working at The

Blind Pig (R. XI-214-215), but he admitted on cross-examination to having a single

$120 shortage on one occasion (R. XI-189-192).  The trial court found it was

"uncontradicted" that the shortages "did stop" after the Petitioner left her

employment; the court never found that Gravlin admitted to having a "handful" of

shortages (Ex. A, p. 16).

Regardless of whether Gravlin had shortages once, or handful of times,

records not introduced by defense counsel demonstrates that records for Gravlin

were only analyzed for eight months, not three years, and that Gravlin had 28

shortages during this time period, 21 of which were in even dollar amounts (C. 505,

Ex. D), a rate of roughly 3.5 shortages for every month that Gravlin worked as the

manager, compared with a rate of roughly 3.29 shortages every month for the

Petitioner (she had 46 shortages in 14 months).  This evidence would have

50

destroyed Gravlin's claim of having only one (or even a "handful") of shortages in three years of work, and thus counsel's failure caused the Petitioner prejudice. Relatedly, and contrary to Gravlin's testimony (R. XI-216)[10], replacements for the Petitioner did have shortages during her vacation periods, as exemplified by Exhibit C (C. 495-505).  This, too, would have undermined Gravlin's testimony that the Petitioner's replacements did not make shortage errors, further demonstrating prejudice because these records would have been further evidence of accounting error as the explanation rather than theft by the Petitioner.

      **c.** **The Petitioner was denied her Sixth Amendment right to the effective assistance of trial counsel when her trial attorney failed to introduce favorable and exculpatory and/or impeachment evidence that would have destroyed her boss' already contradictory and unbelievable claim that he never authorized the Petitioner's bonuses.**

<u>Count 6 (Unauthorized Bonuses)</u>

      Before addressing the specific evidence that defense counsel should have introduced at trial that would have undercut the trial court's findings, it must first be noted how absurd it was for the trial court to rely on Knight's recollection as to whether he orally authorized bonuses to the Petitioner.  Regarding these counts, the

---

[10] The Petitioner could not find in the Record where Gravlin admitted to other employees having shortages while the Petitioner was on vacation, as claimed by the Appellate Court (*Id.* at ¶ 58).  Rather, Gravlin specifically indicated instead that these shortages did not occur while the Petitioner was on vacation (R. XI-216).  If there were such testimony, the court did not reference it in her ruling, instead indicating the shortages "stopped when she was on vacation," which she indicated was circumstantial, but not conclusive, evidence of the Petitioner's guilt (Ex. A, p. 16).  In any event, since this was, at a minimum, contradictory (Knight testified no shortages occurred), defense counsel should have made this clear by actually introducing these records into evidence, especially since the trial court found this evidence "uncontradicted." (*Id.*)

court found it was a matter of credibility whether to believe Knight that he did not

authorize the bonuses, or whether to believe the Petitioner that he did (Ex. A, p.

22). Once again, the court commented that Knight's "lackadaisical business

practices created this problem." (Ex. A, p. 22). The court was surprised that the

same system was still in place even after the Petitioner left. A system where it was

noted that, "apparently bonuses are just handed out with an oral statement, and no

documentation whatsoever," which is "a business practice fraught with problems,

and the potential for misunderstanding or abuse." (Ex. A, pp. 22-23). The

Petitioner claimed that she received several of these oral, informal bonuses from

Knight and therefore was not guilty of theft (Ex A, p. 24). Despite its earlier

expression of incredulity that a business owner would simply authorize managers to

give themselves a bonus based on oral permission (a fact accepted as true by the

trial court) and despite its finding of not guilty on Count 7, regarding unauthorized

salary increases, the court nevertheless determined that Knight could not have

granted the Petitioner bonuses toward the end of her employment because "[Knight]

was unhappy with her attitude and apparently things about her work

performance..." (Ex. A p. 31). Because Knight expressed this to his lawyer, Mr.

Krchak, prior to any financial problems, the court found there was no bias or motive

for Knight to have made up this allegation. *Id.*

Relying on motive or bias evidence to shore up an indisputably unreliable

witness is a highly questionable manner of excusing this unreliability. On cross-

examination, Knight testified at trial that he occasionally give his managers

52

bonuses (R. XII-93).  When pressed regarding specific bonuses that Andy Gravlin received he did not deny giving those bonuses, but he did not specifically remember giving them (R. XII-93-94).  He could not recall whether he gave Gravlin four bonuses in 2013, but he acknowledged that it seemed likely that he did (R. XII-95).  He would have given those bonuses orally and then Gravlin would have gone into QuickBooks and paid himself the bonus (R. XII-95) in the exact same manner in which the Petitioner paid herself the orally authorized bonuses.  When asked if he ever gave the Petitioner oral bonuses, he answered only that he did not give her bonuses to pay off her roof loan (R. XII-96).  However, Knight did not have a promissory note or other documentation of the terms of the roof loan to fall back on (R. XII-97).

Given these facts, relying on Knight's memory of whether he authorized specific bonuses is simply ludicrous.  However, even if one were to entertain this evidence as anything even close to reliable, defense counsel could have easily shot even more holes into this evidence by introducing concrete evidence that would have undercut the trial court's reliance on Krchak to shore up the credibility of Knight.  At that time of trial, trial counsel had in his possession several documents indicating not that Knight considered firing the Petitioner – not over "things about her work performance," as the court found in her ruling without an evidentiary support –but rather because the Petitioner planned to blow the whistle on Knight for sexually harassing customers and employees (C. 376, C. 629).  Evidence of the e-mail exchange between Knight and Krchak answers the question raised by the trial

53

court (Why would Knight give bonuses to someone he wanted to fire?). The answer is simple: the emails, not introduced at trial, demonstrates that Krchak advised Knight to give "soft sell" payments to the Petitioner so that she would walk out the door a happy ex-employee (C. 628) (AMNT, Ex. G) (**Exhibit D** – Attorney Krchak's Emails and Notes). In fact, the meeting between Krchak and Knight had nothing to do with the Petitioner's job performance. In fact, the emails fit neatly with Krchak's trial testimony that the issue Knight had was with the Petitioner was her "loyalty," not her job performance (R. IX-23).

The court only addressed the prejudice prong of *Strickland* in dismissing the evidence regarding Attorney Krchak, but the court did so in a way that was an unreasonable application of *Strickland*. The Court ruled, "a single phrase in Krchak's notes would not be sufficient to support defendant's contention the bonuses were bribes. Trial counsel presented this theory to the trial court but she did not believe the note would lead to an interpretation Knight bribed the defendant." *Minick*, 2018 IL App (4th) 170071-U, ¶ 58. The Appellate Court unreasonably applied *Strickland* in two ways regarding the Krchak evidence. First, the Petitioner did not offer this evidence as nefarious "bribe" evidence, as pejoratively described by the Appellate Court (*Id.* at¶ 58), and in fact, this evidence did not come in the form of a "note," but instead the relevant information was contained in emails between Krchak and Knight. Second, the Court completely misconstrued the Petitioner's argument. On appeal, the Petitioner argued that Knight sought Krchak's service out of fear that the Petitioner was going to make a

54

complaint against Knight for sexually harassing customers and employees, and that Krchak advised Knight to "soft sell" the Petitioner by offering her "some severance payment" in the form of a release of liability (Def. Br. 42-44; C. 635-637, AMNT, Ex. J). While apparently Knight chose not to obtain any release of liability, nevertheless this evidence supports the Petitioner's theory that she was, in fact, given bonuses late in her employment tenure consistent with the "soft sell" approach advised by Krchak in his email exchange with Knight.

Defense counsel was also ineffective in not introducing evidence in the form of Krchak's notes of his conversation with Knight since these notes support the inference that the Petitioner was, in fact, given authorized bonuses beyond her normal salary. Krchak's notes show that the Petitioner received some level of profit-sharing totaling $10,000-15,000 per year from Knight (C. 629, AMNT, Ex. G). The profit-sharing was never brought up at trial and could have supported the inference that the Petitioner did receive a substantial portion of her income from bonuses beyond her normal salary. The Appellate Court did not address this argument, and apparently confused the evidence found in Krchak's "note" with his emails. Ignoring this argument all together was an unreasonable application of *Strickland*.

The Appellate Court unreasonably misapplied *Strickland*, once again, when it indicated the trial court, in its post-trial ruling, indicated "she did not believe the note would lead to an interpretation Knight bribed the defendant." *Id.* at¶ 58. As explained above, this was an unreasonable

55

application of *Strickland* because the prejudice analysis is an objective one,
and not reliant on the *post-hoc* justification of the trial judge. *Harris*, supra,
698 F.3d at 648.

Finally, defense counsel was ineffective for failing to impeach Knight with his
statements to police about whether he ever authorized bonuses to the Petitioner.
Knight insisted – twice – to Officer Kelly[11] that he had never given the Petitioner
any bonuses, but later he recanted this claim and said that he did, in fact, give her
some bonuses (C. 580, AMNT, Ex. F) (**Exhibit E** – Police Reports). This explosive
impeachment not only destroys Knight's credibility, it fronts a genuine possibility
that Knight was intentionally lying about authorizing bonuses rather than being
merely forgetful; at a minimum it shows him to be completely untrustworthy on this
crucial fact.

The Appellate Court found this evidence would have been inadmissible, and
alternatively the Court found there was no prejudice (*Id.* at ¶ 58). Once again, the
Court unreasonably misapplied *Strickland*. First, the reports themselves may not
have been evidence, but Knight's statements to Officer Kelly could have been
proven up by Officer Kelly if denied by Knight (actually, Knight did deny making
the statement, discussed more below). This is just a standard way of impeaching a
witness, and there is nothing inadmissible about such prove-up. M. Graham,
Cleary & Graham's Handbook of Illinois Evidence, § 613.3, p. 686 (2017 ed.). In

---

[11] The Appellate Court mistakenly referred to Officer Patrick Kelly as "Officer
Patrick."

fact, it was disingenuous for the Appellate Court to suggest that the Petitioner could not introduce the report, when it went on to later explain defense counsel's decision to not call Officer Kelly as a witness (*Id.* at¶ 58).

In any event, the Appellate Court chalked up counsel's decision to "trial strategy," however, there was never a hearing wherein the defense attorney testified as to his alleged trial strategy, and thus this blind invocation of the "trial strategy" excuse was an unreasonable application of *Strickland*. Without a post-trial or post-conviction hearing wherein defense counsel was called to explain why he did not attempt to impeach Knight with his prior consistent statement, it is an unreasonable application of *Strickland* to simply use "trial strategy" as a cudgel to stop all debate on the reasonableness prong.   As the Seventh Circuit has explained:

> A court adjudicating a *Strickland* claim can't just label a decision 'strategic' and thereby immunize it from constitutional scrutiny. In Jones's case the state appellate court had no basis in the record to classify counsel's failure to call Stone as a strategic trial choice. [citation omitted] ('[O]n the limited record before the state courts, it was unreasonable to find summarily that trial counsel chose not to call Jones and Taylor as a matter of strategy.')  Because there was no postconviction hearing in state court, Dosch's actual reason for omitting Stone was then unknown. *Jones v. Calloway*, 843 F.3d 454, 464 (7th Cir. 2016).

In any event, chalking up the failure to call Officer Kelly as a witness to impeach Knight could not possibly have been "trial strategy" because defense counsel actually cross-examined Knight on these statements but Knight denied telling the police[12] that he authorized any bonuses (R. XII-73).  To suggest that an attorney

---

[12] Defense counsel asked whether Knight ever told Officer

strategically chose not to prove up something the witness denied during cross-examination is simply nonsensical.

In a case where the issue is whether Knight orally authorized the bonuses at issue – and there was already evidence in the record that Knight offered bonuses to the Petitioner's replacement but could not remember any details about these bonuses – this impeachment would have been crucial.  After all, if Knight could not get his story straight with police when he was first interviewed by Officer Kelly, how credible can Knight's claim later be that he knows conclusively that he never authorized the Petitioner bonuses orally, with no documentation.  No reasonable lawyer would make such a strategic decision to forgo impeach based on the facts of this case.

As far as prejudice, the Court unreasonably applied *Strickland* when it ruled this impeachment evidence "would have merely undermined Knight's credibility and the trial court relied on other testimony when reaching its finding defendant gave herself unauthorized bonuses." (*Id.* at¶ 58).  This reasoning is truly bizarre. Since the issue was whether Knight orally authorized a bonus to the Petitioner, the only two people who could competently testify to such an occurrence would be Knight and the Petitioner, and a trier of fact would thus have to weigh the credibility of both witnesses on this issue.  Demonstrating that Knight changed his story on whether he ever authorized such bonuses would have been crucial to undermining his credibility.

The Appellate Court's reference to "other testimony" that was allegedly more

58

important than the testimony of Knight was apparently the testimony offered by Knight's attorney, Krchak, that Knight was considering firing the Petitioner at the same time he was giving her bonuses, a circumstance that "tip[ped] the scales," in the opinion of the trial court (Ex. A, pp. 37-38). Initially, even under this articulated reason, Knight's testimony was still crucial to the question, and Krchak's testimony was merely a circumstance that "tip[ped] the scale" in favor of believing Knight over the Petitioner. Yet, would not showing that Knight initially was mistaken or lied about this bonus tip the scale in the other direction, given that the Petitioner was always consistent on this issue? Additionally, what is truly maddening about this reasoning is that defense counsel had evidence that would have undermined the very evidence that "tip[ped] the scale" in the State's favor, *i.e.* evidence that, in fact, Krchak suggested Knight "soft sell" the Petitioner as she was leaving her employment by giving her severance pay, in the hope that she would not make any complaints against Knight about his sexual harassment of customers and employees, as explained above. This was an unreasonable application of *Strickland*, not only because the Appellate Court employed illogical reasoning and misstated the record, but because this reasoning fails to take into account the totality of evidence in this case, along with the cumulative impact of all the errors in this case.

<u>Cumulative Error</u>

Finally, but of extreme importance, the Appellate Court did not consider the cumulative effect of all of trial counsel's errors, and further the Court did not consider that cumulative effect of these errors in the context of the overall strength

or weakness of the State's case.  Clearly established federal law requires that

*Strickland* errors must not be addressed "evaluating each error in isolation," but

instead "the pattern of counsel's deficiencies must be considered in their totality."

*Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006); *Strickland*, 466 U.S. at

698.  In other words, courts addressing the prejudicial impact of excluded evidence –

whether due to attorney incompetence or a *Brady* violation – cannot "dismiss each

piece of . . . evidence in seriatim, rather than assessing the cumulative effect" of the

exclusion of all of the evidence.  *Goudy v. Basinger*, 604 F.3d 394, 400 (7th Cir.

2010).

The evidence in this case was extremely weak; indeed, as argued below, it did

not even rise to the level of proof beyond a reasonable doubt.  This is important

because "a verdict or conclusion that is overwhelmingly supported by the record is

less likely to have been affected by errors than one that is only weakly supported by

the record." *Mosley v. Atchison*, 689 F.3d 838, 851 (7th Cir. 2012).  The Appellate

Court reviewed the evidence and found it sufficient, but the Court never indicated

the evidence was strong or overwhelming.  In fact, even putting aside the absurdity

of the State's theory of the case and the inherent weaknesses in the case, even the

trial court found the evidence insufficient as to one of the counts, and on the counts

where the court did conviction the Petitioner, it was only because of a "tip" of the

scales that weighted toward guilty.  In addressing the *Strickland* claim the

Appellate Court never addressed the errors in the context of the strength or

weakness of the case, and it never viewed the errors for their cumulative effect.

60

This was an unreasonable application of *Strickland*.

Regarding the theft counts related to the allegedly missing money, there was plenty of evidence at trial that would have pointed to accounting error, and there was no direct evidence indicating that the Petitioner stole the money at issue. Instead, the State relied on a pattern theory that, at most, raised inferences or suspicions of guilt. Yet, defense counsel had credible and voluminous evidence at his disposal that would have shown that the Petitioner did not just have shortages, but had overages, as well, and that two employees who did the Petitioner's same accounting job had shortage-error rates that were actually higher than those of the Petitioner, thus destroying this supposed clear pattern of shortages that only the Petitioner was making.

As to the unauthorized bonus counts, the State's case relied on an absurd claim – that an owner who admittedly gives out bonuses to employees without documentation – can somehow be relied upon to prove, beyond a reasonable doubt, that he never authorized particular oral bonuses to the Petitioner, especially where that same owner reviews all the payroll records on a yearly basis and has access to this documentation at any time he cares to review them. However, when one adds to the mix that the owner could not keep his story straight on this issue when he spoke to the police, this claim becomes untenable. And, finally, when the supposedly crucial fact that "tips" the scale – the unlikelihood of giving bonuses to an employee at the end of her tenure when the owner was considering firing her for performance issues – turns out to be the exact opposite, *i.e.* that he was paying the

Petitioner to not spill the beans on his sexual harassment of customers and

employees – then it is impossible to have one iota of faith in this criminal

judgement.  Of course, one must also consider the fact that defense counsel also

could have proved that, in fact, that same owner admitted to paying the Petitioner

additional money in the form of "profit sharing" (a form of a bonus), but this is

simply the tip of an iceberg of prejudice.

**II.**    **The Appellate Court unreasonably applied the *In Re Winship* and *Jackson v. Virginia* reasonable doubt standard in finding the State proved its theft case beyond a reasonable doubt.**

**a.  Standard of Review**

It is constitutionally required that a State prove a criminal defendant guilty

beyond a reasonable doubt.  *In re: Winship*, 397 U.S. 358, 362 (1970). 28 U.S.C. §

2254(d) states that a federal court shall not grant a petition for habeas relief with

respect to any claim that was adjudicated on the merits in state court proceedings,

unless the adjudication of that claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established federal law, as
> determined by the Supreme Court of the United States, or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

Subsection (d)(2) presents a test that is not substantively different than the

standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979): the relevant

question is whether, after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt. *United States ex rel Roman v. Washington*, 1996 U.S. Dist. LEXIS 14106 (N.D. Illinois 1996) (quoting *Jackson v. Virginia*, supra); see also *Petronio v. Walsh*, 736 F. Supp. 2d 640 (E.D. New York 2010). While the reasonable doubt standard is deferential, a conviction cannot stand if it is based on mere speculation or guesswork. *United States v. Broxmeyer,* 616 F.3d 120, 125 (2nd Cir. 2010); *United States v. Radomski*, 473 F.3d 728, 730-731 (7th Cir. 2007).

> **b. The evidence presented at trial as to Counts 4 and 5 was insufficient to convict the Petitioner beyond a reasonable doubt of theft because the Petitioner was not the only person responsible for delivering deposit slips, the money was often left unattended and accessible by many employees, and any loss is likely attributable to sloppy business practices and accounting errors.**

This State's case regarding the missing money relied entirely on inferences. There were no admissions, no eyewitnesses to any theft; in fact, there was no evidence that the allegedly missing money was even missing, much less the result of theft. Even if there was theft, it was hardly established that the Petitioner was the only one who could have stolen the money. Instead, these counts relied entirely on inferences, based on an alleged pattern of shortages (a pattern that turned out to be no pattern at all, due to ineffective assistance of counsel, however, the Petitioner confines here arguments here to the actual trial evidence). Yet, a criminal conviction cannot stand based simply on inferences. As the Seventh Circuit just recently explained, "The judge must ensure in both civil and criminal cases that determinations of credibility and the choices among reason-able inferences from the evidence are left to the jury. But in all of these contexts, the judge is still

responsible for enforcing outer limits on reasonable inferences, guided by the relevant standard of proof." *United States v. Garcia*, __ F.3d __, 2019 U.S. App. LEXIS 8311, at *19 (7th Cir. March 20, 2019).  In this case, the State's reliance on speculation and inferences reached the "outer limits" of what is acceptable per the firmly established reasonable doubt standard.

First, as to the alleged theft from deposits (Counts 4 and 5), there was unrebutted testimony at trial that the Petitioner was not the only person who took deposit slips to the bank (R. XI-170) and that in the interim between filling out a deposit slip and taking the money to the bank, dozens of people had access to the room where the money was kept (R. XII-185).  While the trial court found that if there was another individual stealing, the Petitioner should have informed Knight, it also acknowledged that she did inform him of shortages in 2009 and he did essentially nothing to fix that problem (R. XII-186-187) (Ex. A p. 20).  There were shortages or overages on almost a daily basis, yet the owner never changed his sloppy accounting practices —in fact, the trial court noted in its ruling that "it is surprising that in many ways that system is still being used" even during and presumably after the Petitioner's trial (R. XV-7-8).  In fact, it was not unusual for Knight to dip into the cash for personal use –such as getting a haircut (R. XI-172) – and yet nowhere were these personal uses recorded for the accounts.  It was futile for the Petitioner to tell Knight day after day that accounting issues kept arising when he clearly had no interest in changing them.

On appeal, the Petitioner relied on the illustrative *case* of *People v. Frig*, 100 Ill.App.3d 602 (Ill. App. Ct. 1981), since this appears to be the only case on point in Illinois.  Barbara Frig was an office worker who controlled the victims' restitution fund. *Id.* at 603.  An audit revealed that the fund was over $8,000 short, and Frig was charged with stealing the money. *Id.* at 604.  Although Frig had personal charge of the money, the Court noted that the entire office knew where the money was kept, that the office had sloppy procedures for fund management (including irregular bank deposits), and that the money was carelessly handled when the office moved to a different building. *Id.* at 605.  Because of these factors, the court found that not only had the State not proven Frig guilty beyond a reasonable doubt, it had in fact failed to establish the *corpus delecti*; *i.e.*, it failed to establish that a crime had even been committed.  *Id.*

*Frig* is quite similar to the instant case.  As the trial court stated in its ruling, to say the Blind Pig Company had "informal and sloppy" business practices is "an understatement" (R. XV-36).  Just like in *Frig*, money was kept where dozens of employees could access it at any time, and just like in *Frig* (actually, much more so) there are a number of innocent explanations for shortages, which draw into question whether the allegedly "suspicious" ones are even suspicious at all.  As in *Frig*, there are simply too many explanations for the shortages that do not involve criminal behavior for the Petitioner to be convicted beyond a reasonable doubt of stealing from The Blind Pig companies.

65

The Appellate Court attempted to distinguish this case from *Frig* by asserting there was no need for guesswork or speculation as to who took the money in this case because the Petitioner had daily accounting responsibilities. *Minick*, IL App (4th) 170071-U, ¶ 42.   In reaching this conclusion, the Appellate Court unreasonably applied the *In Re Winship* and *Jackson* standard by employing circular reasoning, *i.e.* it is known who did the theft because the Petitioner was the person primarily handling the money; yet, this assumes the missing money was proven to be theft in the first place, a conclusion that cannot give rise to proof beyond a reasonable doubt given the pervasive unreliable nature of Knight's accounting system.

The Appellate Court attempted to further distinguish *Frig* based on the Petitioner's alleged "change of lifestyle." *Id.* at ¶ 44.   The Court ruled:

> Here we have evidence of a change in lifestyle the court emphasized in *Frig* as conspicuously missing.   See *Frig*, 100 Ill. App. 3d at 606.   Before the start of the series of repeated shortages, defendant took out a roof loan from Knight.   Oftentimes defendant would make payments toward that loan in amounts for nearly the total amount of her paycheck.   Defendant could not explain how she made roof payments using almost all of her pay and continued to pay for her other expenses.   The roof loan was also conveniently paid off by the time defendant left her job as manager.   *Id.*

These statements are unsupported by the evidence.   First, there is no evidence that at one point before the roof loan there were no shortages, and that suddenly afterward there was, since there were no deposit slips to analyze before the roof loan.   Second, it is unclear how the Court arrived at the conclusion that the Petitioner could not explain her roof payments, as no such testimony came out

66

during her cross-examination.  There was a videotape introduced into evidence in rebuttal of an interview between the Petitioner and the police, however, no part of this interview was brought up during cross-examination.  Moreover, in that video, the Petitioner explains that at the time of these occurrences, she lived with her fiancé, and that he helped financially support the couple, and, further the undisputed evidence shows that the Petitioner received *two full-time paychecks* for her 80-hour work week, one from The Blind Pig, and one from The Twilight Lounge/The Blind Pig Brewery (R. XII-14-16) (the bonus money came only from The Blind Pig account).  Third, as far as the roof loan being paid off "conveniently" by the time the Petitioner left her job, that is entirely consistent with her being given authorized bonuses, *i.e.* she had extra money that she used to pay off the roof loan. Relying on unsupported evidence, ignoring and misstating evidence, and employing circular reasoning is not a proper method of boosting a series of inferences to the level of proof beyond a reasonable doubt.  As in *Frig*, the State did not prove its case beyond a reasonable doubt and, in fact, did not even establish the *corpus delicti* to establish a crime was committed by anyone, much less the Petitioner, and thus the Appellate Court misapplied the *In Re Winship* and *Jackson* standard in affirming the Petitioner's conviction.

Tellingly, neither the State nor the Appellate Court could cite to one case in Illinois (or elsewhere for that matter) that upheld a theft conviction based solely upon an alleged pattern of accounting shortages (especially when these shortages were of such paltry sums).  The evidence in this case does not establish that any

money was, in fact, missing from daily bank deposits, much less that the Petitioner stole the money.  The Court noted a "pattern" of inappropriate deposits (R. XV-14), but this "pattern" was based solely on a spreadsheet created by the State, obviously created for the purpose of advocacy.  The State introduced evidence of 50 shortage deposits, which turned out to be only 46 upon closer inspection, or about five percent of the deposit slips from the relevant time period, as explained above.  Moreover, the trivia night money ($20 weekly (and sometimes more)) could have accounted for well over $1,000 over the relevant period, and that contrary to the State and the trial judge's assertions, the trivia money could have been withdrawn from any deposit from a preceding week, not just on Sunday (R. XIII-48).

Finally, because small bills were left in the float for the next day's change, variances would almost always be in increments of $10 or $20 (R. XII-175).  While the trial judge claimed to have reviewed all of the exhibits (R. XV-2), she clearly did not, since several "shortages" submitted in the State's spreadsheet, when cross-referenced with the actual deposit slips and ledger envelopes submitted into evidence, were actually not even shortages (C. 382, C. 638-653).[13]  On appeal, the court recognized the State's errors and decreased the restitution amount by $287.  *Minick*, IL App (4th) 170071-U, ¶ 45.

Adding to this questionable pattern evidence is the fact that, upon further review, the State's exhibits contain missing or incomplete information regarding 88

---

[13] The trial judge also claimed that it was apparent that Knight did not sign his taxes (R. XV-29), when the accountant Bob Overstreet clearly stated that Knight signed his taxes (R. XI-229).

deposit slips, which makes any reliance on pure mathematics for a criminal theft conviction particularly suspect.  Of course, when looking at this evidence, one must also consider the fact that the State's entire theory of its case is illogical – that the Petitioner chose to meticulously document her own theft on records that are available for review by her boss and his accountant – as explained in more detail above.  Considering all these factors, the allegedly suspicious pattern disintegrates, and the Petitioner cannot have been proven guilty beyond a reasonable doubt of Counts 4 and 5, because it was not proven that she exerted unauthorized control over the shortages on the Blind Pig deposit slips.

> **c.  The evidence to convict the Petitioner of giving herself unauthorized bonuses was wholly insufficient when the bar owner testified that he gave his managers raises and bonuses and then forgot about them, and thus the Appellate Court unreasonably applied the In Re Winship and Jackson reasonable doubt standard.**

As to the unauthorized bonus count (Count 6), the Petitioner simply cannot be convicted on the testimony of a business owner who admitted at trial that he could not remember whether he authorized bonuses that he definitely authorized (R. XII-95).  Andy Gravlin testified to several bonuses of $500 to $1,000 each, and Chris Knight testified that while he probably authorized those bonuses, he could not remember any of them specifically—and yet his testimony that he did not authorize any of the Petitioner's bonuses was somehow considered by the Appellate Court sufficient to satisfy the reasonable doubt standard.[14]  It is unquestioned that

---

[14] As noted in the Petitioner's ineffective assistance argument, there is actually substantial evidence that was not introduced at trial indicating that Knight was

Knight conducted his business almost entirely orally, and clear that he had a poor memory for payroll decisions (again, "informal and sloppy business practices is an understatement," ruled the trial court). (R. XV-36; Ex A. p. 24). This flimsy testimony accounts for the *only* evidence that the Petitioner's bonuses were unauthorized, and it simply cannot be trusted.

Furthermore, the significance of Bob Overstreet and Chris Knight's testimony regarding the Blind Pig's taxes cannot be overstated. Knight repeatedly denied ever seeing or signing the bars' tax returns (R. XII-85-92), but Overstreet testified that Knight signed all of them (R. XI-241-242). In particular, he signed a W-3 form summarizing all of his employees' payroll every year and attached to that sheet were the W-2 forms indicating what each individual employee's pay was, including the Petitioner's (R. XI-237-239). Not only does this shatter Knight's credibility regarding his involvement with the tax process, it is also an indication on its face that Knight certified—to the federal government, under penalty of perjury—that the W-2 accurately reflected the Petitioner's salary in 2010-2012. This completely upends Knight's claim that he was unaware of the Petitioner receiving raises and bonuses until after the Petitioner no longer worked there. In reality, Knight was perfectly aware of them, because they were all authorized. As a result, the Petitioner cannot have been convicted beyond a reasonable doubt of Count 6, because it was not proven that she exerted unauthorized control over the bonuses she received.

---

actually lying, not merely forgetful.

The Appellate Court unreasonably applied the federal reasonable doubt standard, as articulated in *In Re Winship* and *Jackson*, in finding the evidence sufficient to support a conviction, not only because the evidence on this count was weak, unsupported and contradictory, but also because the Appellate Court misconstrued the record to justify its decision. The Court ruled, "Defendant's contention Knight was put on notice of the bonuses when he signed his taxes ignores the unrebutted testimony, i.e. tax returns do not separate employee wages or payroll." *Id.* at ¶ 51. There was no such "unrebutted testimony." Overstreet testified that Knight signed all of the corporate tax forms (R. XI-241-242), and, in particular, he signed a W-3 form summarizing all of his employees' payroll every year and attached to that sheet were the W-2 forms indicating what each individual employee's pay was, including the Petitioner's (R. XI-237-239).

In summation, the State's theory of the crime simply made no sense. Again, the discrepancies at issue are between the total of amount of money counted in the office, and the total amount deposited at the bank. With both numbers recorded by the Petitioner, the State alleges that the Petitioner documented her own theft in records that were available to and likely to be reviewed by Chris Knight, Bob Overstreet, and (later) Andy Gravlin. If the Petitioner wanted to slowly bleed money from the business, would it not be simpler to pocket extra cash before she filled out the ledger envelope? Alternatively, the Petitioner could have simply collected the bartenders' overages and not documented them—also virtually untraceable, for more than twice the amount of money she is alleged to have stolen

71

through the State's theory of the case (C. 384).  There were over $11,000 of

bartender overages in the period the Petitioner supposedly stole $5,000 (C. 384).

Instead, the State's theory goes, she filled the ledger envelope out correctly, then

stole money before depositing in the bank, thus resulting in meticulous

documentation of her own theft.  The plain explanation for such a discrepancy is

that the Petitioner over counted the money initially and then was corrected by the

bank teller, with no money actually "going missing."  Neither the appellate court

nor the trial court articulated any legal or factual argument for why these

discrepancies should be assumed to be theft, when they could just as easily be

harmless mistakes.

　　　The Petitioner was also alleged to have given herself unauthorized raises and

bonuses, but this allegation is plainly incredible, when the complaining witness,

Christopher Knight, her boss, admitted at trial that he gave the Petitioner's

replacement raises and bonuses, orally, but that he could not remember when he

gave them or how much they were for.  This makes it impossible for the court to

determine with any certitude that the Petitioner was lying when she testified that

she honestly received the bonuses and raises.  In fact, the trial court acquitted the

Petitioner of receiving an unauthorized raise.  Furthermore, in spite of Knight's

testimony that he did not review taxes and would not have noticed increased

payroll, the evidence affirmatively rebutted that testimony: he signed W-2 forms for

every employee and was perfectly aware of the Petitioner's total pay, which

included the bonuses and raises which the Petitioner dutifully recorded in the payroll records (R. X-81-82).

Altogether, the State's evidence is wholly insufficient to convict the Petitioner of theft beyond a reasonable doubt.  It is based on incomplete evidence and the testimony of a witness who could not remember whether he gave a different manager thousands of dollars of bonuses over the course of a year.  Accordingly, this Court should find that the Petitioner was not proven guilty beyond a reasonable doubt and vacate her convictions for theft.

## AFFIDAVITS AND HEARING

This Court could first require the State to produce an affidavit from defense counsel if it is attempting assert decision were made in this case based on trial strategy.  Only if it is clear that such an affidavit, together with the court records and testimony, show there is no possibility of relief, can this Court decide the issue without such an affidavit.  *United States v. Sheneman*, supra, 2014 U.S. Dist. LEXIS 74389, at *44-45 (citing *Kafo v. United States*, 467 F.3d 1063, 1071 (7th Cir. 2006); and *Wright v. Gramley*, 125 F.3d 1038, 1044 (7th Cir. 1997)).  However, "Generally [habeas corpus petitions] claims of ineffective assistance of counsel require an evidentiary hearing." *Struminikovski v. United States*, 926 F.Supp. 113, 115-116 (N.D. Ill. 1996) (citing *Guinan v. United States*, 6 F.3d 468, 471 (7th Cir. 1993)).  Thus, even if the State submits an affidavit from defense counsel in an attempt to rebut the Petitioner's claims, an evidentiary hearing would still likely be required because such an affidavit would serve a similar purpose to those submitted

73

during summary judgment proceedings, *i.e.* " 'to determine whether there is a dispute over a material issue of fact, . . . rather than to allow the judge to resolve the dispute by picking on affidavit over another that contradicts it.' " *Id.* at 116 (quoting *Castillo v. United States*, 34 F.3d 443, 445 (7th Cir. 1994)).  See also *Blackmon v. Williams*, 823 F.3d 1088, (7th Cir. 2016).  Conversely, if no affidavit is submitted, then it should be presumed that defense counsel did not choose to introduce the evidence at issue based on trial strategy, and then a hearing would not be necessary.  Additionally, the Petitioner's reasonable doubt claim does not need a hearing since, by definition, all of the necessary information needed to assess this claim will be contained in the Record.

WHEREFORE, the Petitioner respectfully requests this Honorable Court grant the Petitioners' Habeas Corpus Petition, pursuant to 28 U.S.C. § 2254, as well as the Constitution of the United States.

Respectfully submitted,

s/ Richard Dvorak,
Attorney for the Petitioner,
Rebecca Minick

Richard Dvorak
DVORAK LAW OFFICES, LLC
6262 Kingery Highway, Suite 305
Willowbrook, IL 60527
(630) 568-3190 (p)
richard.dvorak@civilrightsdefenders.com

## VERIFICATION

I, Richard Dvorak, the undersigned, attorney for the Petitioners, swear and affirm that the information contained in this Petitioner are true and accurate to the best of my information and belief, and I filed the above Petition with the Court, via electronic filing, on March 22, 2019.


s/Richard Dvorak
_____
Richard Dvorak

## CERTIFICATE OF SERVICE

I, Richard Dvorak, the undersigned attorney for the Petitioners. hereby certify that on March 22, 2019, I served the above Petition via regular mail upon the Probation Office Of Champaign County, the Circuit Court of the Sixth Judicial District, and the Illinois Attorney General's Office.

s/Richard Dvorak
_____
Richard Dvorak