IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| REBECCA MINICK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 19-2069 |
| | ) | |
| MICHAEL WILLIAMS, Director, | ) | |
| Probation Office of Champaign County, | ) | The Honorable |
| | ) | Colin S. Bruce, |
| Respondent. | ) | Judge Presiding. |

## ANSWER

Pursuant to this Court's March 28, 2019 order, Doc. 4, respondent answers petitioner's petition for a writ of habeas corpus.

## Statement of Facts

Following a Champaign County, Illinois bench trial, petitioner, Rebecca Minick, was convicted of three counts of theft for stealing from two bars where she worked as a manager and bookkeeper.  Resp. Exh. C at 1-2, *People v. Minick*, 2018 IL App (4th) 170071-U.  She was sentenced to thirty months of conditional discharge and ordered to pay more than $10,000 in restitution and fines.  *Id.* at 1.

## Trial

At trial, the State demonstrated that petitioner stole from the bars in two ways: first, after counting the money in the cash registers at the end of the night, she removed some of the cash before depositing the remainder in the bank (as

reflected in discrepancies between the count conducted when the registers were emptied and the amount actually deposited in the bank); and second, by giving herself unauthorized bonuses.

The evidence showed that from 2009 to 2012, petitioner was manager of The Blind Pig and The Twilight Lounge, two bars owned by Christopher Knight. *Id.* at 7. Knight required the manager to "count down" the cash-register drawers and deposit the cash at the bank. *Id.* at 2-3, 5-7. First, the manager removed $440 from each register and returned it to the register for the following shift. *Id.* Then, the manager counted the remaining money and wrote the amount on an envelope containing the cash. *Id.* at 3. This was done separately for each bar. *Id.* If money were stolen prior to counting it — creating a discrepancy between the money recorded in the cash-register system and the money actually in the register — it would be reflected with an "over/under" notation on the envelope, but the envelope count reflected the money actually removed from the register. *Id.* at 7-8. After counting, the manager emailed the totals to Knight and stored the envelopes in a desk monitored by a security camera at The Blind Pig and in a locked office at The Twilight Lounge. *Id.* at 3. The manager then deposited the money at the bank, which generated a deposit slip reflecting the amount deposited. *Id.* Any discrepancy between the amounts on the envelope and the deposit slip could only be attributable to a miscount when the register was counted down, or someone stealing money from the envelope. *Id.*

2

In 2013, Andrew Gravlin, who succeeded petitioner as manager, reviewed the daily envelopes and deposit slips from petitioner's tenure. *Id.* He found forty-six shortages — meaning the amount deposited was less than the amount recorded on the daily envelope. *Id.* Gravlin testified that there had been only "a handful" of shortages in the three years since he had taken over for petitioner. *Id.* at 4. Petitioner testified that the discrepancies were probably due to miscounts of the registers and that she "felt silly about" how many there were. *Id.* at 8. Knight testified that petitioner knew that she was supposed to notify him of discrepancies between the envelopes and deposit slips — and had done so in the past — but did not alert him to any of the shortages at issue in this case. *Id.* at 6. Thirty-nine of the forty-six shortages were for more than $100, and twenty-five of those were for exactly $120. *Id.* at 8. The amounts of all but one shortage were increments of $10. *Id.*

In October 2010, Knight loaned petitioner $22,000 for a new roof. *Id.* at 5. In July 2011, Knight sought legal advice from attorney David Krchak about possibly firing petitioner. *Id.* at 2, 5. Knight ultimately did not fire petitioner because (1) "she informed him she would be leaving within a year," and (2) "he was out of the country for weeks at a time, [and] it would have been difficult to quickly find and train another manager." *Id.* at 6. But Knight testified that "at no point after his conversation with Krchak did he authorize any bonuses for [petitioner] because he was unsatisfied with her performance." *Id.*

3

Petitioner testified that she was unaware that Knight was dissatisfied with her job performance and that Knight orally authorized all of her bonuses.  *Id.* Petitioner also testified that she recorded the bonuses in QuickBooks, to which Knight had access.  *Id.*  Knight acknowledged that in the past he had authorized bonuses orally, but testified that he never accessed QuickBooks to monitor payroll and did not analyze the tax returns prepared by his accountant.  *Id.*  Knight's accountant confirmed that Knight never questioned him about individual compensation and that the tax returns did not reflect individual compensation for anyone other than Knight.  *Id.* at 4-5.

The trial court found defendant guilty of three counts of theft and sentenced her to thirty months of conditional discharge and repayment of $10,500.  *Id.* at 8.

**Direct Appeal**

On direct appeal, petitioner argued, in relevant part, that the State failed to prove petitioner guilty beyond a reasonable doubt and that counsel was ineffective for failing to introduce evidence that (1) while petitioner was manager, there were twenty-one overages (incidents where the amount deposited at the bank was greater than the amount on the envelope); (2) there were numerous shortages when Gravlin and others conducted the count, both when petitioner was on vacation and after Gravlin replaced her as manager; (3) Knight fired petitioner because she threatened to report him for sexually harassing guests and other employees, and Krchak advised Knight to give petitioner money in return for her silence; and

4

(4) although Knight initially told police that he never gave petitioner bonuses, he eventually told them that he had given her some bonuses.  Resp. Exh. A, Brief for defendant-appellant in *People v. Minick*, No. 4-17-0071.

The appellate court modified petitioner's restitution to $10,213, but otherwise affirmed.  Resp. Exh. D at 17.  It held that the State presented sufficient evidence to prove both that petitioner removed money from the envelopes before depositing it and that she issued herself unauthorized bonuses.  *Id.* at 10-14.  It also held that petitioner failed to show that counsel was ineffective for failing to introduce the omitted evidence.  *Id.* at 14-17.  On September 26, 2018, the Illinois Supreme Court denied petitioner's petition for leave to appeal (PLA).  Resp. Exh. F, Order denying PLA in *People v. Minick*, No. 123463, 108 N.E.3d 884 (Ill. 2018) (Table).  She did not file a petition for a writ of certiorari in the United States Supreme Court or any post-conviction petition in the state courts.  Doc. 1 at 5.

## Federal Habeas Petition

Petitioner timely filed her 28 U.S.C. § 2254 habeas petition on March 22, 2019.  Doc. 1.  She claims that: (1) the State failed to prove her guilty beyond a reasonable doubt; (2) counsel was ineffective for failing to introduce evidence allegedly favorable to petitioner; and (3) counsel's cumulative errors rendered his assistance constitutionally ineffective.  *Id.*

## ARGUMENT IN OPPOSITION TO HABEAS PETITION

I. **Procedural Default and the Section 2254(d) Standard**

    A. **Procedural Default**

Before a federal court may consider a habeas claim, the petitioner must afford the state courts a full and fair opportunity to consider the federal constitutional basis of the argument, or risk procedural default. *Johnson v. Pollard*, 559 F.3d 746, 751 (7th Cir. 2009); *Farrell v. Lane*, 939 F.2d 409, 410 (7th Cir. 1991). A procedural default also occurs when a state court disposes of a claim on an independent and adequate state law ground. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Johnson v. Loftus*, 518 F.3d 453, 455 (7th Cir. 2008). To excuse a default, petitioner must show "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that the failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

    B. **Section 2254(d)**

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Where a state court has addressed the petitioner's claim on the merits, a federal court first must determine, based solely on the record before the state court, whether the state court's rejection of the claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("If a

claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.").  In this way, the statute acts as a "relitigation bar" for claims previously adjudicated on the merits in state court, and clearing that bar by means of the listed exceptions in § 2254(d) is "meant to be" a "difficult" undertaking, for federal habeas relief functions only to "guard against extreme malfunctions in the state criminal justice system," *Richter*, 562 U.S. at 102, and "not as a means of error correction," *Greene v. Fisher*, 565 U.S. 34, 38 (2011).

All determinations of fact made by a state court are presumed correct unless the petitioner rebuts that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009).

## II. The Illinois Appellate Court's Judgment that There Was Sufficient Evidence to Convict Petitioner Was Neither Contrary to, Nor an Unreasonable Application of, Supreme Court Precedent.

Petitioner is barred from relitigating her sufficiency-of-the-evidence claim because the Illinois Appellate Court's rejection of it was neither contrary to, nor an unreasonable application of, *Jackson v. Virginia*, 443 U.S. 307 (1979).

Under *Jackson*, due process is satisfied if, when viewing the evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. This standard requires "a reviewing court 'faced with a record of historical facts that supports conflicting inferences [to] presume — even if it does not affirmatively

appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and [to] defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 326).  And challenging the sufficiency of the evidence is virtually impossible on federal habeas review "[w]hen the deference to state court decisions required by § 2254(d) is applied to the state court's already deferential review." *Cavazos v. Smith*, 565 U.S. 1, 2, 7 (2011) (per curiam) (citation omitted).

To prove petitioner guilty of theft, the State had to establish that she knowingly asserted unauthorized control over property and intended to deprive the owner permanently of the benefit of that property.  *See* 720 ILCS 5/16-1.  The Illinois Appellate Court's judgment that the State proved each element for both the deposit discrepancies and the unauthorized bonuses was consistent with Supreme Court precedent and not objectively unreasonable.

The appellate court began its analysis by accurately stating the standard for reviewing a sufficiency claim.  *See* Resp. Exh. D at 9 (citing *People v. Cunningham*, 818 N.E.2d 304, 307 (Ill. 2004) (quoting, in turn, *Jackson*, 443 U.S. at 319)).  It then reasonably applied *Jackson* in concluding that the evidence was sufficient.  With regard to the deposit discrepancies, both Gravlin and Knight testified that the manager was not authorized to take money from the envelopes.  Resp. Exh. D at 3, 5.  And, as petitioner admits, if the money was taken before she counted down the registers, it would have been reflected as an over/under, and not a discrepancy

8

between the envelope and the deposit slip. *Id.* at 7-8. After the money was placed in the envelopes, it was kept in a secure location. *Id.* at 3. But forty-six times during the period in question, the money deposited in the bank was less than the amount written on the envelopes. *Id.* Half of these shortages were for the same amount: exactly $120. *Id.* at 12. The vast majority were for more than $100, and all but one shortage was for an even multiple of $10. *Id.* Petitioner did not notify Knight about any of these shortages, despite having alerted him to such shortages in the past and knowing that she was responsible for doing so. *Id.* This evidence, when viewed in the light most favorable to the prosecution, allowed a rational fact-finder to conclude that petitioner took money from the envelopes before depositing it in the bank.

With regard to the bonuses, Knight testified that he did not authorize any bonuses for petitioner after July 20, 2011, because he was dissatisfied with petitioner's job performance. *Id.* at 2, 5-6. That testimony alone, viewed in the light most favorable to the State, was sufficient for the trier of fact to find petitioner guilty. *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("it is black letter law that testimony from a single witness suffices for conviction"). But here that testimony was corroborated by Krchak's testimony that Knight spoke with him about firing petitioner, and the trial court found both witnesses credible. Resp. Exh. D at 2; *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (federal

habeas court has no license to redetermine credibility of witnesses whose demeanor has been observed by state courts).

Moreover, the evidence established petitioner's motive for stealing money. In October 2010, Knight loaned petitioner more than $20,000. *Id.* at 5. During the period of the thefts, petitioner paid off thousands of dollars towards the loan, oftentimes making payments equal to nearly her full paycheck. *Id.* at 4.

In sum, there was sufficient evidence that petitioner took money from the bars, both from the envelopes and in the form of bonuses, and that she was not authorized to do either. The Illinois Appellate Court's holding that this evidence was sufficient was not objectively unreasonable. Petitioner's arguments disregard the double deference owed to the state court's judgment and impermissibly ask this Court to reweigh the evidence in her favor. *See* Doc. 1 at 63-73; *Cavazos*, 565 U.S. at 2, 7-8; *Jackson*, 443 U.S. at 326. This Court should deny habeas relief on this claim.

**III.    The Illinois Appellate Court's Judgment that Counsel Was Not Ineffective for Failing to Introduce Evidence Allegedly Favorable to Petitioner Was Neither Contrary to, Nor an Unreasonable Application of, Supreme Court Precedent.**

Petitioner is also barred from relitigating her claim that counsel was ineffective for failing to introduce certain evidence because the Illinois Appellate Court's rejection of it was neither contrary to, nor an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668 (1984).

10

To satisfy *Strickland*, petitioner must show both that (1) counsel's performance was deficient, and (2) the deficiency prejudiced her defense. *Id.* at 687. Because *Strickland* establishes a "general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citation omitted). The "bar for establishing that a state court's application of the *Strickland* standard was 'unreasonable' is a high one." *Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003). "[O]nly a clear error in applying *Strickland* would support a writ of habeas corpus because *Strickland* calls for inquiry into degrees, thereby adding a layer of respect for a state court's application of the legal standard." *Id.* (citations, quotation marks, and alterations omitted).

The Illinois Appellate Court began by correctly stating the two-prong test for ineffective-assistance-of-counsel claims:

> A defendant shows ineffective assistance of counsel when [she] shows counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to deprive defendant of a fair trial. Specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Resp. Exh. D at 15 (internal quotations and citations omitted).

The appellate court clearly rejected petitioner's claim for lack of prejudice, and its discussion suggests that it also rejected petitioner's claim on the performance prong, given its statements that certain actions of counsel were not

11

objectively unreasonable. Where it is unclear whether the state court relied on both prongs, this Court should apply § 2254(d)'s standard to both. *See Premo v. Moore*, 562 U.S. 115, 123 (2011). The state appellate court could reasonably reject petitioner's claim for both lack of prejudice and lack of deficient performance.

First, because petitioner cannot establish that there was a reasonable probability of a different outcome had counsel introduced the evidence in question, she cannot demonstrate that the appellate court's judgment finding no prejudice was objectively unreasonable, and her claim fails. *See Carter*, 819 F.3d at 949-50.

As she did in her state court appeal, petitioner identifies several types of evidence that trial counsel did not introduce. Regarding the deposit-discrepancy charges, petitioner asserts that counsel was ineffective for failing to introduce evidence that there were also overages during her tenure as manager and that there were a substantial number of shortfalls when Gravlin was responsible for the count down. *See* Doc. 1 at 41-51. But it was not unreasonable for the appellate court to conclude that this proposed evidence "would be insufficient to persuade the trial court against its finding of a pattern." Resp. Exh. D at 16. Petitioner made forty-six deposits with shortfalls: half of them were for $120 and the vast majority were for more than $100. *Id.* at 12. In contrast, of the twenty-one overages petitioner identifies, only two were for more than $100 and many were for only $1. Resp. Exh. G at CL399-483. Similarly, of the twenty-eight shortages that occurred during Gravlin's first eight months on the job, none were for more than $50 and

12

many were for only $1.  *Id.* at CL512-84.  While these shortages are more than the

"handful" the appellate court describes, the court's point is not unreasonable: a

pattern of shortages of more than $100 each, amounting to thousands of dollars, is

not negated by petitioner's overages or other employees' shortages, where those

discrepancies were never more than $100 and were frequently just a single dollar.

The state court reasonably concluded that introducing this evidence would not have

created a reasonable probability of an acquittal on the deposit-discrepancy charges.

Regarding the unauthorized-bonus charges, petitioner argues counsel was

ineffective for failing to introduce evidence that Knight's conversations with Krchak

were not about firing petitioner for poor performance, but rather about firing her, or

possibly paying her off, because she threatened to report Knight for sexual

harassment.  Doc. 1 at 53-54.  Reaching such a conclusion would require significant

speculation and guesswork regarding the handwritten note and email exchange on

which petitioner relies, and therefore these documents are insufficient to prove

*Strickland* prejudice.

Petitioner first cites Krchak's handwritten note regarding a meeting with

Knight.  The note begins with the question, "Should I fire…"  Resp. Exh. G at

CL636.  It states that petitioner said Knight was sexually harassing customers and

other employees and that Knight was "ruining the business."  *Id.*  But nowhere does

the note suggest that petitioner was threatening to report Knight or that this was

why he was considering firing her.  *Id.*

13

Petitioner also cites an email exchange between Knight and Krchak that purportedly indicates that Krchak advised, or Knight intended, to pay off petitioner. Knight asks Krchak in an email (1) if he has to pay petitioner any compensation upon her release and (2) whether he should threaten to fire her "if her attitude does not improve." *Id.* at CL643-44. Krchak responds to the first question that Knight does not need to compensate petitioner but it might save "money, hassles etc." for him to "provide her some severance payment in exchange for a release of any liability." *Id.* The most reasonable interpretation of this exchange is that Krchak is advising Knight to provide petitioner a severance package to head off any potential wrongful-termination suit, not that he is recommending Knight continue to employ petitioner and provide her unusually large bonuses to buy her silence.

Krchak's answer to the second question is also not helpful to petitioner. Asked whether Knight should threaten to fire petitioner, Krchak responds, "I would only resort to threats if the soft sell approach hasn't worked." *Id.* He then says he would not threaten to fire her until all other avenues for improving her attitude have been exhausted, and advises Knight to have personnel in place to replace her before he takes that step. *Id.* This is entirely consistent with Knight's testimony that he was dissatisfied with petitioner's performance but did not fire her because circumstances made it difficult for him to train a replacement. Nothing in this exchange undermines Knight and Krchak's testimony that Knight consulted Krchak about firing petitioner due to poor performance, or that Knight did not give

14

petitioner any bonuses after this point because he was dissatisfied with her performance.

Nor would evidence that Knight initially denied giving petitioner any bonuses before correcting himself and admitting to police that he did give her some bonuses have materially impeached Knight's trial testimony.  Knight testified that, on occasion, he orally authorized bonuses for petitioner, but did not authorize the bonuses in question and did not give petitioner any bonuses after talking to Krchak.  Resp. Exh. D at 6.  Introducing evidence that Knight told police, consistent with his trial testimony, that he had previously authorized some bonuses for petitioner would not have undermined the credibility of his testimony that he did not authorize *these* bonuses.  Underscoring this conclusion is Gravlin's testimony that Knight occasionally gave him oral authorization for bonuses, but never with the frequency or in the large quantity that petitioner was taking them, *id.* at 4, and Krchak's testimony corroborating Knight's statements that he had stopped giving petitioner bonuses because he was dissatisfied with her job performance.

Indeed, if anything, the evidence that petitioner faults trial counsel for failing to present simply underscored that the number and size of the deposit shortfalls that occurred during petitioner's tenure, and the frequency and amount of the bonuses that she was receiving, were highly unusual.  Accordingly, such evidence potentially undermined her defense, and the Illinois Appellate Court's holding that

15

petitioner was not prejudiced by counsel's failure to introduce such evidence was not objectively unreasonable.

For the same reason, the appellate court could reasonably reject petitioner's claim on *Strickland*'s performance prong. *See Premo*, 562 U.S. at 123. Counsel was not deficient for failing to introduce evidence that may have harmed petitioner's defense. Moreover, counsel's performance is viewed as a whole, *see Richter*, 562 U.S. at 111 ("it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy"), and petitioner's counsel mounted an effective defense. A different attorney may have opted for additional or different cross-examination of state witnesses, but that does not establish that trial counsel's performance fell outside of the "the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689).

Thus, this Court should deny habeas relief on petitioner's ineffective-assistance claim.

## IV.    Petitioner Procedurally Defaulted Her Cumulative-Error Claim.

Petitioner claims that counsel's cumulative errors deprived her of effective assistance of counsel. Because petitioner did not present a cumulative-error claim to either of the state reviewing courts, this claim is procedurally defaulted. *See Hinesley v. Knight*, 837 F.3d 721, 735-36 (7th Cir. 2016) (finding claim that counsel was ineffective due to "cumulative errors" procedurally defaulted because it was not presented as such to state courts); *Puente v. Chandler*, No. 04 C 4877, 2014 WL

16

1318675, at *28 (N.D. Ill. Apr. 1, 2014) (holding cumulative-error theory was procedurally defaulted because petitioner did not present it through one complete round of review).  And because petitioner offers no argument to excuse her default, this Court may not consider her cumulative-error claim.  *See*, *e.g.*, *Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008) (if petitioner fails to argue that a procedural default may be excused, "we cannot consider his claim").  To the extent that petitioner's cumulative-error contention simply rehashes her argument that the state appellate court erred in finding no *Strickland* prejudice, that claim fails. *See supra* Section III.

## V.     This Court Should Not Grant a Certificate of Appealability.

When a district court enters judgment on a habeas petition, it should simultaneously deny or grant a certificate of appealability (COA).  Habeas Rule 11; *Gonzalez v. Thaler*, 565 U.S. 134, 143 n.5 (2011).  To obtain a COA, petitioner must show that reasonable jurists would find it debatable whether (a) her petition states a valid claim of the denial of a constitutional right, and (b) this Court is correct in its procedural rulings.  *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  This Court should decline to certify petitioner's claims for appeal because it is not debatable that they are meritless or procedurally defaulted.

17

**CONCLUSION**

This Court should deny petitioner's petition for a writ of habeas corpus

without granting an evidentiary hearing and deny a certificate of appealability.

July 26, 2019                                 Respectfully submitted,

                                             KWAME RAOUL
                                             Attorney General of Illinois

                          By:     s/ Garson Fischer
                                  GARSON S. FISCHER, Bar # 6286165
                                  Assistant Attorney General
                                  100 West Randolph Street, 12th Floor
                                  Chicago, Illinois 60601-3218
                                  PHONE: (312) 814-2566
                                  FAX: (312) 814-2253
                                  EMAIL: gfischer@atg.state.il.us

18

## **CERTIFICATE OF SERVICE**

I certify that on July 26, 2019, I electronically filed respondent's **Answer** with the Clerk of the United States District Court for the Central District of Illinois using the CM/ECF system, which provided service to Richard Dvorak, counsel for petitioner.

s/ Garson Fischer
GARSON FISCHER, Bar # 6286165
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
TELEPHONE: (312) 814-2566
FAX: (312) 814-2253
E-MAIL: gfischer@atg.state.il.us