E-FILED
Monday, 14 December, 2020  02:39:18 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| REBECCA MINICK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 19-CV-2069 |
| | ) | |
| MICHAEL WILLIAMS, Director of the | ) | |
| Probation Office of Champaign | ) | |
| County, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## O R D E R

Petitioner, Rebecca Minick, filed her Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (#1) on March 22, 2019.  On July 26, 2019, Respondent filed a Response (#11).  For the following reasons, the Petition (#1) is DENIED.

## I.  BACKGROUND

The facts in this background section are taken from the record of the state court proceedings, and from *People v. Minick*, 2018 IL App (4th) 170071-U.  As to factual matters, "[t]he state court's factual determinations are entitled to a presumption of correctness, and the petitioner has the burden of overcoming this presumption by clear and convincing evidence." *Thompkins v. Pfister*, 698 F.3d 976, 983 (7th Cir. 2012).

Petitioner challenges some of the state court's factual determinations and she discusses

additional facts; those issues will be discussed in the Analysis section of this Order.

A. <u>State Trial Court Proceedings</u>

Petitioner was the manager of two bars: The Blind Pig and The Twilight Lounge.

In December 2013, Petitioner was charged with three counts of theft in connection with

that employment.  In August 2015, the charges were amended to counts IV, V, and VI.[1]

Counts IV and V alleged Petitioner knowingly exerted unauthorized control over

property exceeding $500 by taking cash currency during her employment at The Blind

Pig and The Twilight Lounge, respectively. Count VI alleged she knowingly exerted

unauthorized control over property exceeding $500 in the form of unauthorized

bonuses while employed at The Twilight Lounge.

The case proceeded to a bench trial.

1. *The State's Witnesses*

At trial, the state presented the testimony of: David Krchak, an employment law

attorney; Andrew Gravlin, the businesses' current manager; Bob Overstreet, the

businesses' accountant; and Christopher Knight, the owner of the businesses.

a.  Employment Attorney, David Krchak

David Krchak testified that Knight consulted with him in July 2011 about

whether and how to terminate Petitioner's employment.

---

[1] A seventh count was added.  Petitioner was later acquitted on Count VII; this Order
focuses on Counts IV-VI.

b.  Manager, Andrew Gravlin

Andrew Gravlin was the manager of the Blind Pig and Twilight Lounge at the time he testified.  He took over that position from Petitioner, who trained him on how to do that job.  His responsibilities as manager were substantially the same as Petitioner's were when she was manager.  He had significant control over day-to-day operations and exclusive control over payroll, quarterly taxes, and generating W–2 forms for tax purposes.

Gravlin testified he probably received two or three bonuses a year, at most $1,000 each, and never in consecutive pay periods.  Knight would orally tell Gravlin to write himself a bonus, and Gravlin would put the bonus into QuickBooks, the payroll and accounting system.  Payroll records showed he received four bonuses in 2013.  Knight never asked Gravlin for the QuickBooks password.

Gravlin described the process for "counting down the drawers" of the registers for both businesses, which he did every morning for the previous day.  This job is done only by the manager.  First, he took $440 from the total cash of each register and put it back in the register so that bartenders could use it, "the float," to make change.  Then he counted the remaining money, separately for each business.  He put the cash for each business into its own daily envelope, wrote the total amount of cash on the envelope, and filled out a deposit slip to take with the cash to the bank.  Managers were required to send a daily email to Knight stating the amount of money recorded on the envelopes after it was "counted down."

3

After the money was counted, it was kept in a bank bag on a desk in the basement of the Blind Pig, monitored by a security camera, and in a locked office at the Twilight Lounge.  It was usually deposited the same day, leaving little time for someone to take cash out of it, but sometimes the bag would not be deposited the day it was counted and other employees could access the desk and obtain the key to the office.

If an employee stole money during a shift, that would not result in a discrepancy between the money "counted down" and the money deposited at the bank—it would be missing before being "counted down."  A discrepancy between the daily envelope and the deposit slip could result from an initial miscount of the money or from someone taking money from the amount to be deposited.

In 2013, Gravlin compared past daily envelopes and deposit slips filled out and submitted at the bank by Petitioner, in her handwriting.  "Shortages" occurred forty-six times, meaning the amount deposited by Petitioner was less than the amount recorded on the daily envelopes.  There were also some overages during that time period.

Gravlin testified that the persistent pattern of shortages ceased when Petitioner stopped working at the businesses.  There were still some discrepancies after Petitioner left, including "a handful" of shortages over three years.

 Gravlin also testified about printouts from Quickbooks which indicated that Petitioner had a roof loan from Knight.  They showed that she paid off $6000 of the loan with bonuses ranging from $250 to $3000 in 2011 and 2012, oftentimes using nearly all her paycheck to make roof loan payments.

### c.  Accountant, Bob Overstreet

Bob Overstreet prepared the yearly, federal income taxes for the businesses based on information from QuickBooks.  Knight signed the tax forms, generally without reviewing them or questioning the tax preparation.[2]  Knight did not ask questions about individual compensation.  Knight's compensation was individually recorded as an officer of the corporation, but the compensation for all other employees was added together into one figure on the form.  Overstreet received a copy of the roof loan and repayment schedule but did not speak with Knight about it until 2012 when Knight asked how and in what increments it had been paid off.

### d.  Bar Owner, Christopher Knight

Christopher Knight, the owner of the Twilight Lounge and Blind Pig, also testified.  In the words of the Illinois Appellate Court, "Knight's system of ownership can be described as hands off."  *Minick*, 2018 IL App (4th) 170071-U, ¶ 19.  He did not handle payroll, tax preparation, daily accounting, or deposits.  He did not use QuickBooks, or even have its password.  He did not take charge of the day-to-day management or problem solving of the business; a manager did.  Managers were never authorized to take any currency from the daily revenue.  Knight occasionally took deposits to the bank if he had time and the manager was busy.

---

[2] Petitioner argues that the trial court incorrectly found that Knight did not review his tax records, because Knight signed off on them as accurate.  However, Overstreet testified that Knight signed the forms without reviewing them.

After Knight's father died in 2010, Knight began going to England for extended periods, to settle his father's estate.

In October 2010, Knight loaned Petitioner $22,000 for a new roof.

In July 2011, Knight discussed Petitioner's employment with employment attorney Krchak, after having issues with her attitude at work. He testified that "she was rude and harder to deal with and wasn't responding to things I would ask her to do." Knight decided not to fire Petitioner because she told him she would be leaving within the year, and he would have had a hard time quickly finding and training another manager while he was out of the country for weeks at a time.

Knight did not authorize any bonuses for Petitioner after the July 2011 conversation with Krchak, because he was unsatisfied with her performance at that time. He did not authorize bonuses to expedite repayment of the roof loan. He did not give her bonuses in consecutive pay periods. He did not give her bonuses in the amount of $3000. He did not check individual payroll information. He did not know in 2011 and 2012 that Petitioner received sometimes thousands of dollars in bonuses to repay the roof loan. Petitioner continued to work until she voluntarily left in March 2012, shortly before her wedding. Knight believed she paid off the loan before leaving.

In April 2013, Knight saw Petitioner at an event. She was unfriendly, and he "thought maybe if she really disliked me that much she may not have been as honest as I thought she was." Knight then spoke with Overstreet about the roof loan. Overstreet told him that the loan had been "fairly well" paid back due to all the bonuses Knight had given Petitioner. Knight testified that this was the first he learned of bonuses that

6

he had not authorized.  Knight also spoke with Gravlin, and together they then discovered Petitioner's 46 shortages.

Knight testified that Petitioner knew she was supposed to alert him to any shortages in her daily emails.  She had reported shortages in the past, which once resulted in her and Knight discovering that another employee had been stealing from the business.  But, disregarding policy, Petitioner did not alert Knight about any of the 46 shortages.  The security videotape keeps footage for two weeks, so because Knight had not been alerted to the shortages in that time frame, he did not check the tape.

Knight also testified that he includes the managers of his bars in his will to inherit the business if they are managing the bar at the time Knight dies.  Petitioner was in his will until she left his employment in 2012 and Gravlin was in the will after her.

### 2.  *Petitioner's Testimony*

Petitioner also testified at trial.  She was the manager of The Blind Pig and The Twilight Lounge from 2009 to 2012.  Her daily procedures and tasks were the same as Gravlin's.

Petitioner testified that she never knew Knight was unsatisfied with her performance as manager.  She testified that Knight orally gave her all the bonuses she recorded in QuickBooks.  If she did not want Knight to know about a bonus, she probably would not have documented it in QuickBooks, which they both could access.

Petitioner described how she would count the money every day for the two bars. For each bar there were two drawers—a "happy hour" drawer and a "close drawer." The bartenders would place the drawers in the locked basement when they left their

7

shifts and Petitioner would count the drawers the following morning.  She would "count down" the drawers, placing the $440 in small bills back in the drawer as "the float."  Petitioner also kept a separate backup drawer for change to make sure there were plenty of smaller bills and quarters.  After counting the drawers from both bars, she would write the amounts on the envelope to record the daily totals.

Petitioner would combine the happy hour and close drawers from the Twilight Lounge to make one deposit for that bar, and she would similarly combine the happy hour and close drawers from the Blind Pig to make another deposit to the Blind Pig account.  She combined the happy hour and close drawers from one bar, then she would complete the deposit slip for that bar.  She tried to make change from the cash that she had available but would sometimes submit a change order to the bank.

Once everything was counted and the drawers and change piles had the appropriate bills, Petitioner would put the deposits for both bars in a bag.  That bag would sit in the office of the Blind Pig until Petitioner was able to take it to the bank— sometimes it would be in a few hours, but if she was very busy it could be a few days.  All the bartenders could access the office.

When asked about shortages, Petitioner testified that the deposit slip and the envelope she filled out would usually match until she got to the bank. The bank would notice the difference between the deposit slip and the cash that she was trying to deposit and ask her to correct it.  Discrepancies leading the teller to direct her to change the amount on the deposit slip happened often enough for Petitioner "to feel silly about

it." She would either initial a change on the deposit slip or be asked by a teller to fill out a new one.

Petitioner agreed that if someone stole money from the deposits before she counted them, that would show in the "over/under" for the day but not result in a discrepancy between the daily envelope and the deposit slip. A miscount was probably the reason for differing figures, but another employee could have taken the money. The area the deposits were kept was open to all employees, and bartenders would be in the basement multiple times a day for work.

Petitioner acknowledged that security cameras recorded the area and the money could not be reached without passing by the camera. She agreed that 39 of the 46 shortages were for over $100, that 25 of them were for exactly $120, and that all but one shortage was in $10 increments. She testified that she had brought instances of shortages to Knight's attention in the past, and he had not changed the daily accounting procedures, so she thought it was pointless to keep alerting him even though she knew it was part of her duties. She also testified that in 2009, she discovered some shortages, she notified Knight of the shortages, and he put up a motion sensor camera in response.[3]

---

[3] Referred to as "shortages" in her testimony, Petitioner's brief argues they were "over/unders" where a bartender's sales did not match the amount in their drawer. Knight testified that Petitioner was to notify him of shortages.

### 3.   *Conclusion of Trial, Posttrial Motions, and Sentencing*

On July 29, 2016, the state trial court found Petitioner guilty on counts IV, V, and VI, and not guilty on a seventh count concerning unauthorized raises.

Petitioner then retained new counsel and filed a motion for a new trial based on ineffective assistance of counsel.  Petitioner's motion also argued that the State failed to meet its burden of proof.  The trial court denied the motion.

The court sentenced Petitioner to thirty months of conditional discharge, with $10,500 in restitution.

### B.  State Appellate Court Proceedings

Petitioner appealed her conviction.  She argued: (1) the State failed to produce sufficient evidence for the trial court to convict her on the three counts of theft, and (2) trial counsel was ineffective in failing to introduce exculpatory evidence and to present impeaching evidence.  *Minick*, 2018 IL App (4th) 170071-U, ¶ 34.

Finding the evidence sufficient to prove Petitioner's guilt beyond a reasonable doubt, and concluding that counsel was not ineffective, the Illinois Appellate Court affirmed Petitioner's conviction.  *Id*. at ¶ 63.

Petitioner filed a timely Petition for Rehearing, which the Appellate Court denied.  She then filed a timely Petition for Leave to Appeal.  The Illinois Supreme Court denied leave to appeal on September 28, 2018.

10

## II.  ANALYSIS

Petitioner filed her habeas Petition (#1) on March 22, 2019.  She raises two issues.
First, she argues that her trial counsel was ineffective, denying her Sixth Amendment
right to the effective assistance of counsel, and that the Appellate Court unreasonably
applied established federal law in denying her ineffective assistance claim.  Second, she
argues that she was not proven guilty beyond a reasonable doubt, in violation of her
Fifth Amendment rights, and that the Appellate Court unreasonably applied federal
law in denying her sufficiency of the evidence claim.

The court will address those issues in the order the Illinois Appellate Court did:
first the sufficiency of the evidence issue, then the ineffective assistance issue.

### A.  Sufficiency of the Evidence

#### 1.  *Legal Standard*

A claim that the evidence in support of a state conviction was insufficient to
allow a rational trier of fact to find a person guilty beyond a reasonable doubt is a
federal constitutional claim that may be raised in a federal habeas petition.  *Jackson v.
Virginia*, 443 U.S. 307, 320-24 (1979).  If a claim is properly brought, an "applicant is
entitled to habeas corpus relief if it is found that upon the record evidence adduced at
the trial no rational trier of fact could have found proof of guilt beyond
a reasonable doubt."  *Id.* at 324.  In making that determination, the record is viewed in
the light most favorable to the prosecution.  *Id.*

The record establishes that the state court adjudicated the sufficiency of the
evidence claim on the merits.  Claims adjudicated on the merits in state court

proceedings are not open to relitigation in federal court unless the petitioner can establish that the state court proceedings resulted in a decision that was: (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C § 2254(d)(1), (2).  Further, a petition can simply be denied on the merits.  28 U.S.C. § 2254(b)(2).

The issue here, then, is whether the Appellate Court reasonably applied the *Jackson* standard in holding that the evidence was sufficient to convict Petitioner. See *U.S. ex rel. Jackson v. Page*, 972 F. Supp. 1140, 1154 (N.D. Ill. 1997).

### 2. *Application*

Petitioner was found guilty of three counts of theft: Counts IV, V, and VI. Counts IV and V alleged Petitioner knowingly exerted unauthorized control over property exceeding $500 by taking cash currency during her employment with both bars, while Count VI concerned unauthorized bonuses while employed at The Twilight Lounge.

The Illinois Appellate Court cited the *Jackson* standard in analyzing the sufficiency of the evidence argument.  *Minick*, 2018 IL App (4th) 170071-U, ¶ 38.  The court finds that the Appellate Court applied that standard reasonably on Counts IV, V, and VI.

"A person commits the offense of theft when she 'knowingly: (1) [o]btains or exerts unauthorized control over property of the owner * * * and (A) [i]ntends to

12

deprive the owner permanently of the use or benefit of the property.'" *Id.* at ¶ 40, quoting 720 Ill. Comp. Stat. 5/16–1(a)(1)(A) (West 2010).

Viewing the evidence in the light most favorable to the prosecution and with the added deference appropriate on federal habeas review of a state Appellate Court decision, the evidence was sufficient to prove Petitioner's guilt beyond a reasonable doubt.

Concerning the deposits, Petitioner's job included counting down the registers and depositing the money at the bank. There were 46 shortages, totaling over $5,000, that Petitioner knew about as she had to correct the deposit slips at the bank so often that she "felt silly." She knew it was her job to inform Knight of those shortages, but she did not mention any of the 46 shortages to him despite emailing him every day. Of those 46 shortages, 39 were for over $100, 25 were for exactly $120, and all but one shortage was in $10 increments. Thus, the amounts were not random or often small, as could be expected with miscounts; instead the amount was the same large number, $120, just over half of the time, and over $100 most of the time.

Petitioner claimed she did not inform Knight of the 46 shortages at issue because doing so would have been pointless. However, the trial court was not obligated to believe that explanation. Countering that explanation was Petitioner's testimony that she had notified Knight of discrepancies in the past, which led him put up a motion sensor camera. Security camera footage could have been reviewed if Knight had been notified within two weeks of a shortage.

Petitioner also asserts that it makes no sense that she would document her thefts. But, with Knight's hands-off approach to running his businesses and the expectation that his manager would notify him of shortages, he would not have been expected to notice the discrepancies. And, even if a better way of committing thefts could have been devised, the evidence was sufficient to prove that Petitioner chose this method. With the evidence showing that Petitioner would have known of Knight's hands-off approach, the chosen method of theft does make sense. Indeed, the discrepancies were not discovered for about a year and likely may never have been discovered but for a social encounter gone wrong.

Concerning the bonuses, Knight testified that he did not authorize the bonuses, while Petitioner testified that he did. The trier of fact believed Knight. The Appellate Court found that belief was not unreasonable. This court cannot say that the Appellate Court's decision was unreasonable. Supporting it and the trial court's findings, Knight talked to Krchak about his unhappiness with Petitioner before she received $5,000 in bonuses. The factfinder could find that Knight would not have given those bonuses at a time he was so unhappy with Petitioner that he consulted with an attorney about firing her. The bonuses—bigger and more frequent than the bonuses received by Gravlin, who Knight was happy with—allowed Petitioner to pay off her roof loan right before leaving her job.

Petitioner relies on the case of *People v. Frig*, 426 N.E.2d 1251 (Ill. App. Ct. 1981), arguing that the Appellate Court's attempts to distinguish that case are unreasonable applications of the *Jackson* standard. As *Frig* is a state case, this federal habeas court will

14

not use it as a basis to overturn the Appellate Court's decision.  In any event, this court

does not find that the Appellate Court unreasonably applied *Frig*.  The evidence in this

case was sufficient to permit a reasonable factfinder to conclude that Petitioner

committed the thefts.

B. <u>Ineffective Assistance of Counsel</u>

*1. Legal Standard*

In order to succeed on a claim of ineffective assistance, a defendant must show:

(1) that counsel's performance was objectively unreasonable under prevailing

professional norms; and (2) that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "The benchmark for judging a claim of

ineffectiveness must be whether counsel's conduct so undermined the proper

functioning of the adversarial process that the trial cannot be relied on as having

produced a just result."  *Strickland*, 466 U.S. at 686.  "The burden upon a defendant

pressing such a claim is a 'heavy one.'"  *Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990).

"The defendant must affirmatively establish that counsel's performance was both

constitutionally deficient and that the deficiency prejudiced the outcome of the trial."  *Id*.

This court, however, is not simply applying *Strickland*, but is reviewing whether

the state court's application of *Strickland* was unreasonable.  See *Murrell v. Frank*, 332

F.3d 1102, 1111 (7th Cir. 2003).  "The bar for establishing that a state court's application

of the *Strickland* standard was 'unreasonable' is a high one[.]"  *Id*.  "[A]n *unreasonable*

application of federal law is different from an *incorrect* application of federal law."
*Williams v. Taylor*, 529 U.S. 362, 365 (2000) (emphasis in original).

To demonstrate an unreasonable application of federal law, "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Generally, federal courts presume that the state court's "factual determinations are correct unless [the petitioner] rebuts the presumption by clear and convincing evidence." *Newman v. Harrington*, 726 F.3d 921, 927 (7th Cir. 2013). This includes credibility determinations. *Murrell*, 332 F.3d at 1112. "This standard is demanding, but not insurmountable." *Newman*, 726 F.3d at 928. Federal courts conclude that a state court decision was based on an unreasonable determination of the facts "if it rests upon factfinding that ignores the clear and convincing weight of the evidence." *Id*.

The record establishes that the state Appellate Court adjudicated the ineffective assistance of counsel claims on the merits, citing to and applying the *Strickland* standard, so this court must review whether the Appellate Court's application of *Strickland* was so incorrect as to be unreasonable.

16

2. *Application*

Petitioner argues that her trial counsel was ineffective when he failed to present certain evidence that the shortages were the result of accounting errors and when he failed to present impeachment evidence. She argues that the Appellate Court unreasonably applied *Strickland*. The State argues that the Appellate Court could reasonably reject Petitioner's ineffective assistance claim.

a. Shortages, Counts IV and V

Petitioner claims that trial counsel did not introduce numerous pieces of evidence that would have shown that the shortages were the likely result of accounting errors, not theft, impacting Counts IV and V. She points to overages that she deposited, shortages by other employees, some listed shortages that were not actually shortages, and Krchak's notes of his meeting with Knight.

The Appellate Court did not find Petitioner's overages significant, stating: "The mere fact defendant experienced overages does not negate a showing of 46 different instances when she deposited an amount substantially less than what was recorded on the daily [envelopes]." *Minick*, 2018 IL App (4th) 170071-U, ¶ 58. This finding is entitled to deference, as it is a reasonable one. Of the 21 overages identified by Petitioner, only two were for more than $100 and many were for only $1. By contrast, the shortages were usually in the exact amount of $120, and almost always over $100. The overages appeared random or small, with many that were $1. A focus on Petitioner's overages would highlight the non-random nature of the shortages, and the

17

larger amounts of the shortages.  It was not reasonably likely to have affected the outcome of the trial.

The Appellate Court also did not view Gravlin's and other employees' shortages as significant, because the evidence still supported the trial judge's finding of a pattern of Petitioner's shortages.  Petitioner argues that the Appellate Court mistakenly viewed Gravlin as having only a "handful" of shortages.  The court agrees that there were more than a handful of shortages when Gravlin became manager but disagrees on the Gravlin shortages' significance.  None of the identified Gravlin shortages were for more than $50.  Some were for $1.  Focusing on these shortages would also risk highlighting how large Petitioner's shortages were, and again how the overages were so frequently for the exact same large amount.  Plus, the $1 shortages undermine Petitioner's argument that shortages would be expected to occur only in $10 increments.  The Appellate Court's finding that the other employees' shortages would not change the outcome of the trial is not unreasonable.

The Appellate Court concluded that the dates that were not actually shortages meant that the restitution amount needed to be amended but had no impact on the finding of guilt.  This court again finds that conclusion reasonable.  The 46 instances of the amounts at issue result in the same conclusion absent the identified non-shortages.

The state court reasonably concluded that the unintroduced items relied upon by Petitioner would not have created a reasonable probability of an acquittal on Counts IV and V.

b.  Unauthorized Bonuses, Count VI

Petitioner argues that trial counsel could have used documents he had in his possession to undercut Knight's credibility that he did not authorize the bonuses, because the documents indicate that Knight wanted to fire Petitioner because she planned to blow the whistle on Knight for sexually harassing customers and employees. Petitioner points to an email exchange between Knight and Krchak, Krchak's notes of his conversation with Knight, and Knight's statements to police as reflected in police reports.

In an email, Knight asked Krchak if he had to pay Petitioner compensation when terminating her and whether Krchak thought Knight should tell Petitioner that he would fire her "if her attitude does not improve."  Krchak responded that compensation upon discharge was never mandatory; he was only suggesting possible benefits to a severance payment in exchange for a liability release.  Krchak advised Knight against threatening to fire Petitioner unless a "soft sell" approach failed, noting her importance to the businesses and the need for someone who could step in to replace her.

The court agrees with the State that this email exchange is not helpful to Petitioner.  Nowhere in the email does Krchak advise Knight to give Petitioner unusually large and unusually frequent bonuses.  And, the email indicates that Knight did have problems with Petitioner's attitude, so it could have bolstered the State's theory that Knight would not give large, frequent bonuses to someone he thought had an attitude problem.

Krchak's notes mention "$50,000 year + 10,000-15,000 profit sharing," which Petitioner argues "could have supported the inference that Petitioner did receive a substantial portion of her income from bonuses beyond her normal salary." But it is far from clear what that note means. It is not expressed in any form complete enough to show that Petitioner was given bonuses—it does not explicitly mention bonuses. It does not synch with the amount of bonuses received in a year by Petitioner or Gravlin, not even the year Petitioner received the large bonuses. And, it was written before the series of larger and more frequent bonuses at the center of Count VI.

Krchak's notes also reference a discussion about sexual harassment of customers and another employee, but Petitioner does not appear to make any argument based on that language in her Petition. Her argument in the Petition that the bonuses were to prevent Petitioner from blowing the whistle on harassment seems to be based on the email exchange only. To the extent that it is based on the note, it still does not make sense that Knight's response to a contentious relationship would be to give Petitioner larger and more frequent bonuses when, instead, he was asking an attorney about whether he could fire her *without* a severance payment.

Lastly, Petitioner argues that trial counsel was ineffective for failing to impeach Knight with Knight's statements to police. A police report states that Knight "did learn that Rebecca gave herself bonus pay on seven different days from March 21, 2011 to February 20, 2012, totaling $6,000. Chris never agreed or allowed Rebecca to give herself bonus pay." It seems to the court that the police report's references to Knight not giving bonus pay were specific to the seven dates mentioned in the police reports.

In any event, Knight testified that he did orally authorize bonuses for Petitioner other than those seven bonuses.  That testimony was consistent with Gravlin's testimony that Knight sometimes gave him oral authorization for bonuses.  The police report evidence would not have significantly undermined Knight's credibility that the bonuses at issue were not authorized.  The reports just state again that the seven bonuses at issue were not authorized.

c.  Cumulative Error

Petitioner also argues that the Appellate Court failed to consider the cumulative effect of all of trial counsel's errors.  It is true that the Appellate Court did not explicitly address a cumulative error argument.  However, the Appellate Court did not find that counsel committed multiple errors, so there were not multiple errors for it to aggregate.

This court finds that the trial court's finding that trial counsel was not ineffective was not unreasonable, even considering any errors combined together.  In the Appellate Court, the State conceded that a few shortages listed were not actually shortages.  Here, the State concedes that Gravlin had more shortages than noted.  However, the court finds that the outcome of the trial would not have been different had trial counsel treated that evidence differently.  The Appellate Court's conclusion that trial counsel was not ineffective was not unreasonable.

C.  <u>Certificate of Appealability (COA)</u>

A COA may issue only if "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This court concludes that

Petitioner has not made a substantial showing of a denial of a constitutional right with respect to any of her claims.  Therefore, this court finds that a COA is unwarranted.

IT IS THEREFORE ORDERED THAT:

(1)  Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (#1) is DENIED.

(2)  A certificate of appealability is DENIED.

(3)  This case is terminated.

ENTERED this 14th day of December, 2020

s/COLIN S. BRUCE
U.S. DISTRICT JUDGE